CARMEN ELADIA REYES ET AL., demandantes y recurridos, *v.* PHOENIX ASSURANCE COMPANY y DR. HUGO RAMÍREZ TORRES, demandados y recurrentes.

*Número:* R-71-123 *Resuelto:* 16 de octubre de 1972

872

*Vicente Santori Coll,* abogado de los recurrentes; *Román & Landrón,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR MARTÍN emitió la opinión del Tribunal.

La cuestión principal que plantea el presente recurso es si la muerte de la menor María de los Angeles Rodríguez fue causada por la negligencia de un médico o del personal del Dispensario Municipal Borinquen de Santurce, el cual pertenece al Municipio de San Juan. Plantea además la suficiencia de prueba para demostrar los daños sufridos por los demandantes.

El tribunal sentenciador expone claramente lo acontecido en sus determinaciones de hechos:

"1—El día 8 de febrero de 1966 la niña de 7 años María de los Angèles Rodríguez tropezó con otro estudiante en el patio de la escuela donde cursaba estudios primarios. Al sufrir la caída la menor quedó atontada y fue asistida por el conserje de la escuela, Miguel Resto Bermúdez, y por su madre, quien todos los días la llevaba al plantel y la recogía. Al caer la niña se dio un golpe en la cabeza en el lado izquierdo al nivel de la oreja y sufrió una laceración frente a la misma oreja. La maestra le administró los primeros auxilios y ordenó a la madre que llevase a la niña al Dispensario Borinquen de Barrio Obrero. En ese momento la niña estaba medio atontada. La madre tomó un taxi y llevó la niña al dispensario.

2—Después de esperar un poco en el dispensario, la niña fue pasada por la enfermera a la Sala de Emergencia donde la atendió el Dr. Hugo Ramírez Torres. El Médico examinó los oídos de la niña con el otoscopio sin que notara una hemorragia en ellos. También examinó los ojos de la niña con el mencionado instru-

mento, que se convierte en oftalmoscopio, y no notó nada anormal. Le palpó el cráneo y no pudo detectar fractura. También hizo la prueba de Babinski que resultó negativa. El médico entendió que no se trataba de nada grave, a base del examen y de la conversación que tuvo con la madre, pero, no obstante, le advirtió rutinariamente a la madre que si observaba vómitos o inconsciencia en la niña la trajera de nuevo. Le recetó tres dosis de penicilina a ser administrada en tres días consecutivos. La primera dosis se administró en ese momento. La enfermera curó el rasguño frente a la oreja con un antiséptico. No se tomaron radiografías del cráneo, que hubieran descubierto la fractura, ni se anotaron los hallazgos negativos del examen. La prueba que tuvo ante sí el tribunal demuestra que esa es la práctica en los dispensarios públicos. Es una práctica deficiente según el testimonio del propio demandado y así también la calificó el perito médico del demandante. La madre se llevó la niña para su hogar.

3—En la casa la madre notó que su hija no estaba bien. Vomitó esa noche. Al día siguiente la madre llevó a la niña a ponerse la segunda inyección, le dijo a la enfermera lo del vómito y pidió ver al médico pero fue desalentada en su empeño por el personal del dispensario que solo le puso la inyección. Resultado neto fue que por acción y omisión del personal del dispensario no pudo ver al médico. El tribunal entiende que las enfermeras en este segundo día no se percataron de la seriedad de la situación, como debieron y pudieron percatarse y esas actuaciones y omisiones sellaron la suerte de la niña.

4—Al tercer día la niña volvió a vomitar. Fue llevada de nuevo al dispensario donde la vio otro médico, que se alarmó. Inmediatamente fue llevada al hospital donde se le sacaron radiografías que demostraron que había sufrido una fractura en el cráneo; ya era muy tarde, el estado de coma había sobrevenido y la niña falleció pocas horas después. La autopsia demostró que la causa de la muerte de la menor María de los Angeles Rodríguez fue una hemorragia en el espacio epidural cuyo hematoma produjo compresión sobre el hemisferio cerebral izquierdo. En la autopsia no hubo hallazgos de otorragia (hemorragia en el oído). No había evidencia externa de la fractura. En vida pudo haberse descubierto mediante la toma de buenas radiografías. Se trataba de una fractura por separación o dehiscencia en la unión del parietal y la escama del temporal. Esta fractura

según el patólogo probablemente produjo la hemorragia de la rama de la arteria meníngea media que se encuentra en ese sitio."

En base a las precedentes determinaciones de hechos el tribunal concluyó que tanto la negligencia del médico como la del personal del dispensario (fijando en 50% la responsabilidad del primero y en 50% la de los últimos) fueron la causa próxima de la muerte de la menor.

Los demandados Phoenix Assurance Company y Dr. Hugo Ramírez Torres[1] fueron condenados a satisfacer a los demandantes las siguientes sumas: $20,000 a Carmen Eladia Reyes, madre de la menor; $5,000 a Joaquín Rodríguez, esposo de Carmen Eladia; $2,000 respectivamente a Doña Enriqueta Rodríguez y a Don Alfonso Rodríguez, abuelos de la niña y $2,000 en concepto de honorarios.

El tribunal de instancia concluyó, como cuestión de derecho, que la negligencia del médico consistió en la omisión de tomar una radiografía a la niña al llegar ésta al dispensario por vez primera teniendo en cuenta el atontamiento que sufrió la niña al darse el golpe, cuya omisión impidió el diagnóstico correcto; y al no dar instrucciones adecuadas a la madre analfabeta para impresionarla de las consecuencias fatales que podían sobrevenir si no traía "insistentemente y a todo trance" a la atención de un médico cualquier episodio de vómito que sufriera la niña.

En cuanto a la negligencia del personal del dispensario el tribunal de instancia concluyó, como cuestión de derecho, que su actuación había sido negligente al desalentar o impedir

---

[1] El Municipio de San Juan nunca fue demandado en el caso de autos. Los abogados de dicho municipio, sin embargo, comparecieron en representación del co-demandado Dr. Hugo Ramírez Torres por la reclamación que excede la cuantía de la póliza expedida por la codemandada Phoenix Assurance Company aunque hubo una comparecencia de los abogados del Municipio en representación de éste, la misma fue retirada posteriormente por dichos abogados, confirmándose ésta por resolución tribunal.

que la madre entrara la niña a la oficina del médico del dispensario el día siguiente, después de haberles explicado la madre que la niña había vomitado la noche anterior.

Los demandados-recurrentes señalan ocho errores. Los primeros cinco impugnan la determinación del tribunal en cuanto a la negligencia del médico y del personal del dispensario. El sexto y séptimo cuestionan la suficiencia de prueba demostrativa de los daños y el octavo señala la improcedencia de la suma impuesta en concepto de honorarios.

Por estar los cinco primeros errores interrelacionados pasamos a discutirlos conjuntamente. Hemos sostenido que existe una presunción, rebatible, en casos de responsabilidad profesional médica, al efecto de que el médico ha ejercitado un grado razonable de cuidado y de que la administración del tratamiento al paciente ha sido adecuada. Corresponde al demandante presentar evidencia suficiente para controvertir esta presunción y para ello la prueba debe demostrar algo más que una mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional. Si la evidencia señala más de una causa probable del daño, no puede imponérsele responsabilidad a éste a menos que del conjunto de la prueba surja que la actuación negligente atribuida a éste es la que con mayores probabilidades la causó. *Rivera* v. *E.L.A.*, 99 D.P.R. 890 (1971); *Sáez* v. *Municipio de Ponce*, 84 D.P.R. 535 (1962). El médico debe tener latitud en el ejercicio de un juicio razonable y no es responsable por un error de juicio a menos que el error sea obvio o sustancial de acuerdo con la práctica prevaleciente en la comunidad. Si el médico ejerce el cuidado y presta la debida atención al diagnóstico del paciente conforme a la práctica profesionalmente aceptable en la comunidad y actúa de acuerdo con las mismas, no incurre en responsabilidad aunque su diagnóstico constituya un error de juicio. *Rivera* v. *E.L.A.*, supra; *Pérez* v. *E.L.A.*, 95 D.P.R. 745 (1968). Ya este Tribunal ha establecido que la práctica

profesional de la comunidad, o prevaleciente en la comunidad, cuando ese término se usa como norma contra la cual medir el cuidado ejercido y el tratamiento administrado en un caso específico, no quiere decir la práctica pobre sino la práctica que llena las exigencias profesionales reconocidas, o sea, la práctica aceptable profesionalmente hablando. *Pérez* v. *E.L.A.*, supra. Lo que constituye una práctica profesional adecuada se determina generalmente a través del testimonio de los expertos médicos. *Guzmán* v. *Silén*, 86 D.P.R. 532 (1962); *Rivera* v. *Dunscombe*, 73 D.P.R. 819 (1952). Véase: *Necessity of Expert Evidence to Support an Action for Malpractice against a Physician or Surgeon*, anotación en 81 A.L.R.2d 597.

Tomando las anteriores normas generales como punto de partida examinemos la conducta del médico codemandado en el caso ante nos. El Dr. Ramírez hizo un diagnóstico que resultó luego estar equivocado. Lo que en realidad resultó ser fractura en el cráneo según reveló la autopsia practicada, fue diagnosticado por dicho médico como una simple laceración. Siendo la norma general que un médico no es responsable por un error en el diagnóstico siempre que ejerza el cuidado y siga las normas de buena práctica profesional que se practican en la comunidad, según hemos expuesto precedentemente, la cuestión ante nos se reduce a determinar si de acuerdo a la prueba pericial aportada en la evaluación y reconocimiento de la menor el Dr. Ramírez se ajustó a dicha práctica profesional o si por el contrario hubo una desviación de la misma.

Como perito de los demandantes testificó el neurocirujano Dr. Rafael Longo Cordero. El interrogatorio a que fue sometido dicho perito consistió principalmente de una serie de preguntas hipotéticas basadas en los hechos que las partes intentaban probar. Gran parte de los hechos que luego estimó probados el tribunal de instancia respecto al tratamiento de la niña por el Dr. Ramírez están contenidos

en una de dichas preguntas hipotéticas. (²) A base de los hechos que se le pidió que asumiera, que como puede verse son sustancialmente los que estimó probados el tribunal, el Dr. Longo concluyó que no había habido desviación alguna del tratamiento adecuado a suministrarse a un paciente en el estado de la niña afectada. El único elemento que falta en dicha pregunta hipotética y que obviamente fue de gran peso en la determinación del tribunal sentenciador fue la circunstancia del "atontamiento" de la menor. (³) Hemos examinado detenidamente la transcripción de evidencia en este caso y debemos concluir que el récord está huérfano de evidencia alguna que demuestre que la menor estuviese atontada cuando fue vista por el Dr. Ramírez. (⁴) El propio Dr. Longo

(²) En dicha pregunta se le pidió al Dr. Longo lo siguiente: "¿ . . . asuma que esta niña de siete años sufrió una caída, sufrió un golpe en la cabeza, no sufrió inconciencia, la llevaron al dispensario médico por la mañana, el doctor la ve en el dispensario esa mañana, la niña no está desorientada, no se queja de dolor de cabeza . . . no tenía vómitos ni náusea, estaba actuando normal ante el médico. Se le hace examen del oído con otoscopio y está normal, se le hace examen de reflejos y es negativo, se le hace examen de la pupila y también es negativo y entonces se le nota una laceración en la oreja, se le lava, se le da tratamiento para la herida y se le manda a la casa con la madre, se le apercibe de que si tiene vómitos, si se ve soñolienta, dolor de cabeza, que inmediatamente la lleve nuevamente al dispensario. Asuma que lo que se vacía en el récord médico es esta información que aparece en esta hoja que le estoy mostrando en estos momentos, que es el Récord Médico de la Sala de Emergencia, asuma además, doctor, que a los dos días la llevan a la niña al Hospital Municipal en estado de emergencia y en estado 'de inconsciencia y la niña muere debido a un hematoma epidural, le pregunto si a base de esa información, de esos hechos, si en su opinión ha existido una desviación en el tratamiento adecuado a suministrarse a un paciente en ese estado en que fue atendida?

"R Basándome en eso no, no ha habido desviación ninguna."

(³) El tribunal concluyó que la menor quedó atontada inmediatamente después del golpe pero no hace determinación alguna en cuanto a si en el momento en que el médico la vio existía dicha condición. Y, aunque concluye que dado el atontamiento de la niña se le debió haber tomado radiografías, no hay prueba que sostenga dicha conclusión.

(⁴) Por el contrario, el Dr. Ramírez testificó que la madre le había indicado que la niña no había perdido el conocimiento y que traía la niña a instancia de la maestra porque ella no le notaba nada. Además, las

indicó que a pesar de que la niña sufriera los traumas que en efecto tuvo, no necesariamente debía presentar síntomas anormales. Más aún, un estudio del conjunto del testimonio del Dr. Longo demuestra que el atontamiento, contrario a la inconsciencia, no es factor determinante por sí sólo en el diagnóstico.

 Es conveniente señalar que la determinación de negligencia como consecuencia de la omisión de tomar radiografías, depende de la necesidad de ella según las circunstancias de cada caso. Véanse, *Floyd* v. *Walls*, 168 S.W.2d 602; *Bickford* v. *Lawson*, 81 P.2d 216; *Ross* v. *Hatchette*, 251 So.2d 820. No puede exigirse que todo golpe en la cabeza requiera la toma de radiografías. El médico debe tener latitud dentro de un juicio razonable. A esos efectos el Dr. Longo opinó que el médico debe tener discreción para decidir si la magnitud del golpe requiere el uso de radiografías. El testimonio del Dr. Ramírez, que fue corroborado por el patólogo Dr. Juan Velázquez, revela que la niña no demostraba evidencia externa de trauma excepto una raspadura de la piel a nivel e inmediatamente delante de la oreja izquierda. No fue hasta abrir las cavidades, que el patólogo encontró evidencia de trauma cráneo-cerebral, la cual no era palpable al examen. El análisis de la prueba demuestra que no había razón para tomar radiografías de acuerdo a la condición que presentaba la niña al ser examinada por el Dr. Ramírez.

El testimonio pericial, y especialmente la contestación del perito a la pregunta hipotética a que hicimos referencia anteriormente, revelaron que las advertencias hechas a la madre de la menor por el médico fueron las apropiadas.

En vista del precedente análisis resolvemos que la conclusión del tribunal de instancia al efecto de que el Dr. Ramírez fue negligente en el tratamiento de la niña María de los

---

determinaciones de hecho del juzgador son al efecto de que "el médico entendió que no se trataba de nada grave, a base del examen y de la conversación que tuvo con la madre."

Angeles Rodríguez no está sostenida por la prueba presentada.

■ Aunque el Dr. Ramírez no incurrió en negligencia al examinar y hacer el diagnóstico del paciente es conveniente señalar que nos preocupa su omisión de hacer las debidas anotaciones en el récord de la paciente sobre el resultado de las varias pruebas que efectuó y sobre las advertencias que hizo a la madre de la niña en relación con los síntomas que debía observar. Convenimos con el perito médico en que constituye buena práctica el hacer dichas anotaciones en el récord para beneficio de cualquier otro médico que tuviese que intervenir en el caso posteriormente. En esa forma puede seguirse la trayectoria de la dolencia o enfermedad, facilitando la evaluación de los cambios habidos entre un examen y otro. Como resultado de esto el paciente queda protegido.

Aunque la falta de dichas anotaciones en el récord no necesariamente constituye negligencia *per se*, dicha omisión puede ser un factor a considerarse en la credibilidad que el médico merezca al tribunal con respecto al tratamiento que dio al paciente. La clase médica puede protegerse contra algunos pleitos injustificados con un récord médico completo y adecuado.

Por la importancia que ello tiene nos parece propio señalar que las entidades pertinentes deben hacer un esfuerzo tendiente a que los récords de hospitales y dispensarios sean llevados en forma uniforme y que en los mismos se anoten las pruebas o exámenes que los médicos lleven a cabo así como los resultados de los mismos, aun si éstos fueren negativos, como también las advertencias u observaciones que se le hagan a los pacientes o a sus familiares. Ello puede ser tan importante como el tratamiento a que son sometidos los pacientes. Sobre el contenido de récords médicos y sobre la necesidad de que los mismos sean llevados adecuadamente, véase: Hayt & Hayt, *Legal Aspects of Medical Records*, 1964, cap. 1, pág. 1; University of Pittsburg, Health Law Center,

*Hospital Law Manual*, Medical Records, pág. 1; Chayet, *Legal Implications of Emergency Care*, 1969, pág. 54; .Louisell and Williams, *Medical Malpractice*, Vol. I, pág. 183 *et seq.*

Lo dicho no dispone del presente recurso. Resta por determinar la alegada negligencia de los otros empleados del dispensario. Surge del testimonio de la madre de la menor y de las determinaciones de hecho del tribunal que luego de ver al Dr. Ramírez la niña vomitó por la noche. Al día siguiente la madre llevó a su hija al Dispensario Municipal Borinquen a ponerle la segunda inyección que le había recetado el Dr. Ramírez e informó a las enfermeras que su hija había vomitado. No surge con claridad de su testimonio que ella insistiera en ver al médico. Tampoco surge que ella llamara la atención a las enfermeras de que el médico le había advertido sobre la importancia del vómito, sino por el contrario alega que el médico no le había hecho advertencias de clase alguna. Tampoco contenía el récord médico indicio alguno de que la condición de la niña podía revestir seriedad. Por el contrario, el récord demostraba que la niña había tenido sólo una laceración de la cual fue curada, y por ello el médico sugirió una inyección anti-tetánica y tres dosis de penicilina. No había nada en el récord que alertara las enfermeras. Tampoco hay evidencia de que la niña, en ese segundo día, demostrara anormalidad alguna. La imprecisión del testimonio de la madre al respecto de que no la dejaron pasar a ver al médico, unido al hecho de que las alegaciones de la demanda imputan exclusiva negligencia al médico, debilitan la posición de la parte demandante quien viene obligada a probar su caso por la preponderancia de la evidencia. En nuestra opinión no fue probada negligencia alguna de las enfermeras.

A pesar de la conclusión a que hemos llegado, aprovechamos la ocasión que nos presenta este caso para advertir a las enfermeras que rinden servicios en los dispensarios u hospitales que éstas no deben atribuirse las facultades de los

médicos. Estamos obligados a censurar la práctica de que aquéllas asuman tales facultades a espaldas de éstos. Su obligación hacia el paciente y con el médico es llamar la atención a éste de los síntomas o quejas de aquéllos. Los pacientes se merecen el cuidado esmerado y responsable de las enfermeras de dichas instituciones. En muchas ocasiones la enfermera es el único medio de comunicación entre el médico y el paciente. No puede permitirse que el paciente quede . exclusivamente a merced de los caprichos o deseos de las enfermeras.

En vista de las conclusiones a que hemos llegado se hace innecesario considerar los otros errores levantados por la parte demandante.

*Se revocará en todas sus partes la sentencia recurrida.*

El Juez Asociado, Señor Hernández Matos, disintió. El Juez Asociado, Señor Torres Rigual, concurrió en el resultado.