HILDA A. RAMOS ROBLES, SIXTO ESCOBALES APONTE y OTROS, demandantes y recurridos, *v.* DR. JOSÉ A. GARCÍA VICARIO y DR. RAÚL GONZÁLEZ NÁPOLES, demandados y recurrentes.

*Número:* RE-90-38          *Resuelto:* 20 de diciembre de 1993

970

*Miguel Limeres Grau*, de *Parra, del Valle, Frau & Limeres*, abogado de los recurrentes; *Serafín Rosado Santiago* y *Jaime L. Pérez*, abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Mediante recurso de revisión acuden ante nos el Dr. José García Vicario y el Dr. Raúl González Nápoles para solicitar que revoquemos la sentencia dictada por el Tribu-

nal Superior, Sala de Ponce, que resolvió que ambos médicos habían cometido impericia médica al practicar una episiotomía en la línea media con el propósito de ampliar el área para el alumbramiento de la demandante Hilda A. Ramos Robles, causándole una laceración de tercer grado en el área perineal lo que trajo como consecuencia que la demandante sufriera de incontinencia fecal.

I

El 6 de octubre de 1986 la señora Ramos Robles, su esposo Sixto Escobales Aponte por sí, y en representación de la sociedad legal de gananciales constituida por ambos, presentaron una demanda por impericia médica contra los doctores García Vicario y González Nápoles. Además, demandaron a la Administración del Fondo de Compensación al Paciente.[1] En la demanda alegaron que "a los fines de facilitar el parto a [la demandante], los médicos demandados le practicaron una operación denominada episiotomía, cuya finalidad es ampliar el área para el alumbramiento de la criatura". Añadieron que "la mencionada operación practicada a la demandante se hizo de una manera anormal y descuidada, de manera negligente e inexperta, ocasionando que se le lesionaran a la demandante músculos y órganos de su sistema excretorio [y que] como resultado de ello la demandante ha padecido desde aquella fecha un problema de incontinencia o falta de control sobre su sistema excretorio". Demanda, pág. 2.

Los hechos que dieron lugar a la presentación de la demanda, son los siguientes.

El 22 de junio de 1985 Ramos Robles acudió a la oficina de los demandados porque se encontraba en estado de

---

[1] Mediante Sentencia parcial de 18 de noviembre de 1986, el tribunal de instancia desestimó la demanda contra la Administración del Fondo de Compensación al Paciente porque, al momento de los hechos, no existía cubierta ni póliza a favor ni en beneficio de los doctores García Vicario y González Nápoles por éstos no haber hecho aportación alguna a la administración.

embarazo. Durante el período de embarazo, la mayoría de las ocasiones en que visitó la oficina fue atendida por el doctor García Vicario, aunque también fue atendida por el doctor González Nápoles. El 3 de febrero de 1986 Ramos Robles fue ingresada en el Hospital San Lucas de Ponce a cargo del doctor González Nápoles porque presentaba contracciones desde tempranas horas de la mañana. Momentos antes del alumbramiento, el doctor González Nápoles entendió que era necesario hacer una episiotomía en la línea media del área perineal de Ramos Robles.[2] Al nacer el niño, el doctor González Nápoles se percató que la paciente había sufrido una laceración de tercer grado en dicha área. Procedió a suturar la herida. Ramos Robles permaneció en el hospital hasta el 5 de febrero de 1986 cuando fue dada de alta por el doctor García Vicario.

El 13 de febrero de 1986 Ramos Robles regresó a la oficina de los demandados y fue atendida por el doctor García Vicario, quien le indicó que por la condición que presentaba era necesario referirla a unos cirujanos proctólogos. La paciente fue referida al doctor Sánchez Gaetán. Este le recomendó operarla, ya que tenía que corregir el esfínter anal, músculo encargado de controlar la salida de heces fecales. Ramos Robles presentaba una fuerte infección en esa área, por lo que tuvieron que esperar un tiempo para operarla de una esfinteroplastía (operación para reparar el esfínter). Mientras tanto, la paciente continuó padeciendo de incontinencia fecal y gases. El 26 de abril de 1986 fue operada. El 2 de junio fue su última visita con el doctor Sánchez Gaetán por, según ésta, haber tenido discrepancias con él. El 3 de enero de 1987 fue atendida por el Dr. Filiberto Colón, quien la refirió al Dr. Ignacio Echenique, cirujano de colon y recto. Ramos Robles tuvo que ser operada el 13 de marzo de 1987 (para la reconstrucción del esfínter) por di-

---

[2] El área perineal se define como el espacio que media entre el ano y los órganos sexuales.

cho médico. Ya para esta fecha Ramos Robles había presentado su demanda.

En su contestación a la demanda, los médicos coincidieron en que el tratamiento brindado a la demandada fue el adecuado dentro de la mejor práctica de la medicina para la obstetricia y ginecología. Además argumentaron que los daños alegados por la demandante son complicaciones inherentes a la condición en que se encontraba la paciente al momento del alumbramiento. Luego de varios incidentes procesales, se celebró la vista en su fondo y el tribunal de instancia dictó sentencia declarando con lugar la demanda y concluyó que todos los daños causados a la demandante fueron ocasionados por la impericia médica de los demandados.[3] En sus determinaciones de hecho señaló que "[c]onforme la mejor práctica de la medicina la episiotomía medial no era la más recomendable en este caso y fue la que ocasionó la laceración de tercer grado y los daños posteriores sufridos por la demandante". Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho y Sentencia, pág. 5. En síntesis, en su sentencia el tribunal señaló otros actos negligentes que utilizó para la determinación de responsabilidad torticera: (1) que se esperó a última hora para realizar la episiotomía; (2) que debido a la posición del bebé hacia abajo (*vertex*) y un área perineal corta debió practicarse la episiotomía medio lateral, en vez de la episiotomía en la línea media, toda vez que en la medio lateral no hay ningún riesgo de lacerar el esfínter anal; (3) que el doctor González Nápoles omitió hacer anotaciones en el expediente médico del hospital sobre la laceración sufrida y las partes que sufrieron daño; (4) que debió haberse recetado un antibiótico para evitar infecciones; (5) que la reparación de la laceración de tercer grado fue negligente; (6) que la demandante no fue orientada

---

[3] La parte demandante ofreció el testimonio pericial del Dr. Juan J. Hernández Cibes, mientras que los demandados presentaron al Dr. Raúl Mari Rodríguez y otra prueba documental. Ambas partes estipularon varios expedientes médicos.

adecuadamente de las consecuencias de la laceración y el cuidado postnatal y fue dada de alta por el doctor García Vicario con tan solo una crema llamada *dermoplast*.

Por último concluyó que, a consecuencia de estos actos negligentes, Ramos Robles ha padecido desde aquel entonces de una condición de incontinencia fecal por lo que ha tenido que ser operada en dos (2) ocasiones. Su vida matrimonial y social se ha afectado grandemente por esta situación. Al estimar los daños sufridos, condenó a ambos médicos al pago de una compensación total de seiscientos mil dólares ($600,000) por angustias y sufrimientos mentales, mil seiscientos ocho dólares ($1,608) por ingresos dejados de percibir, más quince mil dólares ($15,000) de honorarios de abogado.

Ambos médicos no están de acuerdo y acuden ante este Foro para que revisemos. Señalan cuatro (4) errores que entienden el tribunal de instancia cometió al adjudicar esta controversia:

[1.]  Incurrió en error manifiesto el Tribunal de Primera Instancia al aquilatar la prueba en forma arbitraria, lo que no representa el balance más racional, justiciero y jurídico de la totalidad de la prueba presentada.
[2.]  Incurrió en error manifiesto el Tribunal de Primera Instancia en las sumas que concedió por vía de compensación.
[3.]  Incurrió en error manifiesto el Tribunal de Primera Instancia al no admitir los originales de los récords médicos de la demandante en la oficina del Dr. García Vicario.
[4.]  Incurrió en error el Tribunal de Primera Instancia al no permitirnos presentar prueba a tenor con la Regla 49.2 de las de Procedimiento Civil vigente, que tiene que ver con la credibilidad del Dr. Juan José Hernández Cibes. Petición de revisión, pág. 5.

El 8 de febrero de 1990 expedimos el auto de revisión y ordenamos que se elevaran los autos, la transcripción de evidencia y la prueba documental. Las partes han comparecido. No habiendo trámite ulterior, procede resolver la controversia planteada.

## II

■ Al delinear los contornos de la responsabilidad de un médico en el desempeño de sus funciones profesionales, hemos establecido la norma de cuidado médico exigible al amparo del Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141. Se espera que el médico ofrezca aquella atención médica que a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisfacen las exigencias generalmente reconocidas por la profesión. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988); *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1980); *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 820 (1987); *López v. Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197 (1978); *Negrón v. Municipio de San Juan*, 107 D.P.R. 375 (1978); *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973).

■ Dentro del ámbito de sus funciones se le reconoce al médico una latitud amplia en su discreción al momento de formular su juicio profesional en cuanto al diagnóstico y tratamiento médico. Hemos rechazado imponer responsabilidad cuando el médico ha utilizado su buen juicio profesional y el mismo es cónsono con lo razonablemente aceptado por muchos sectores de la profesión médica. *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871, 876 (1972); *Pérez v. E.L.A.*, 95 D.P.R. 745 (1965); *Morales v. Hosp. Matilde Brenes*, 102 D.P.R. 188, 194 (1974); *Lozada v. E.L.A.*, 116 D.P.R. 202 (1985). Un error de juicio honesto y razonable fundamentado en un desacuerdo latente entre las autoridades médicas sobre el diagnóstico o tratamiento recomendable nó constituye un acto negligente que sujete a responsabilidad torticera. *Ríos Ruiz v. Mark*, supra, pág. 821.

■ Al evaluar la actuación de un médico no podemos olvidar que a éste lo acompaña una presunción al efecto de que ha ejercido un grado razonable de cuidado y el trata-

miento fue adecuado. El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya tenido éxito no crea ninguna presunción de negligencia por parte del médico. La parte demandante no podrá descansar para rebatir esta presunción en una mera posibilidad de que el daño se debió al incumplimiento de parte del médico de su obligación profesional. Ello requiere que la relación de causalidad no se establezca a base de una mera especulación o conjetura. *Rodríguez Crespo v. Hernández*, supra, pág. 650; *Sáez v. Municipio de Ponce*, 84 D.P.R. 535 (1962); *Ramos Orengo v. La Capital*, 88 D.P.R. 315 (1963). Una vez desfilada la prueba, si la evidencia señala la existencia de múltiples causas no puede imponérsele responsabilidad al médico a menos que del conjunto de la evidencia surja que con mayor probabilidad la actuación negligente fue la causa del daño. *Reyes v. Phoenix Assurance Co.*, supra, pág. 876; *Rivera v. E.L.A.*, 99 D.P.R. 890 (1971); *Sáez v. Municipio de Ponce*, supra.

██  Por último, cuando se trata de evaluar las determinaciones sobre impericia médica que están fundamentadas en la prueba pericial y documental ofrecida, este Tribunal está en igual posición para evaluarlas y hacer sus propias conclusiones. *Ríos Ruiz v. Mark*, supra, pág. 820; *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719 (1983); *Velázquez v. Ponce Asphalt*, 113 D.P.R. 39 (1982).

Partiendo de las normas jurisprudenciales anteriores, examinemos la conducta de los médicos García Vicario y González Nápoles y veamos si el primer error se cometió.

III

De la transcripción de evidencia se desprende que el 3 de febrero de 1986 la demandante fue hospitalizada en el Hospital San Lucas de Ponce. A eso de las 6:15 A.M. se notificó la admisión y condición de la paciente al doctor González Nápoles, quien ese día estaba a cargo de los pacientes

de la oficina que compartía con el doctor García Vicario. Este impartió algunas instrucciones. A las 7:10 A.M. se le conectó a la demandante un monitor fetal externo. Surge de las notas de la enfermera que la demandante se encontraba bastante intranquila. El doctor González Nápoles visitó a la paciente a las 7:55 A.M. y le hizo un examen vaginal. Posteriormente, la demandante fue trasladada a la sala de parto y fue examinada por el doctor González Nápoles a las 8:10 A.M. Surge del expediente médico que el demandado aplicó anestesia local y practicó una episiotomía por la línea media.

En el caso de autos se le imputó negligencia a los médicos demandados por practicar una episiotomía en la línea media. Según la prueba documental ofrecida y el testimonio pericial, una episiotomía es un procedimiento quirúrgico que se hace mediante una incisión en el área perineal, esto es, en el espacio que existe entre el ano y el órgano sexual femenino con el propósito de ampliar el área para así acelerar el parto vaginal y proteger el perineo. Buxton and Muram, *Clinical Obstetrics*, Vol. 2, Cap. 69, pág. 1 (*Exhibit* Núm. 1(d) de la parte demandada).

La razón para utilizar la episiotomía en la obstetricia ha sido que este procedimiento (1) protege los tejidos blandos de la madre de la sobredistensión y de la avulsión, y de esta manera se evita que ocurra una relajación pélvica sintomática en el futuro; (2) protege la cabeza del feto de presiones excesivas o prolongadas ocasionadas por el tejido de la madre, y (3) provee una incisión quirúrgica controlada en lugar de la herida traumática potencialmente irregular y anatómicamente menos precisa que suele ser más difícil de reparar. Buxton and Muram, *op. cit.*, pág. 1 (*Exhibit* Núm. 1(d) de la parte demandada). Existen tres (3) tipos de episiotomía: en la línea media, la mediolateral y la lateral.

La episiotomía en la línea media se efectúa a lo largo del rafe del perineo desde el principio hacia abajo, pero sin

incluir el músculo esfínter del ano. Este tipo de incisión es la más sencilla y anatómicamente atraviesa la adherencia fibrosa de los músculos y no las fibras del músculo. Véase Buxton and Muram, *op. cit.*, pág. 2 (*Exhibit* Núm. 1(d) de la parte demandada).

Por otro lado, la *mediolateral* es una incisión que comienza desde la comisura del área perineal hacia abajo, pero a diferencia de la episiotomía en la línea media ésta no sigue en línea recta sino que se aleja hacia uno de los lados.

Al comparar ambas episiotomías, las autoridades médicas coinciden en que la episiotomía en la línea media es más fácil de reparar, cicatriza bien, es menos dolorosa, en raras ocasiones ocurre dispareunia, los resultados anatómicos finales son casi siempre excelentes y la extensión a través del esfínter anal hacia el recto es más común. Por el contrario, la episiotomía mediolateral es más difícil de reparar, más difícil de sanar, un dolor por varios días en un tercio de los casos, la dispareunia suele ser frecuente, los resultados anatómicos suelen ser más o menos imperfectos en un diez por ciento (10%) de los casos y la extensión a través del esfínter es menos común, pero puede ocurrir. Véase *Conduct of Normal Labor and Delivery*, Cap. 17, pág. 429. (*Exhibit* Núm. 1(a) de la parte demandada); Buxton and Muram, *op. cit.*, pág. 2 (*Exhibit* Núm. 1(d) de la parte demandada).

La episiotomía en la línea media está contra indicada cuando el área perineal sea muy pequeña y cuando el tamaño del bebé sea grande, debido a que existe el riesgo de lacerar el esfínter. La episiotomía mediolateral se utiliza cuando se necesita más espacio y cuando el perineo es corto. El problema con ésta es que invade los músculos y los planos faciales alterando estos tejidos en mayor grado que la episiotomía en la línea media. También se corre el riesgo de lacerar el esfínter. Véase Buxton and Muram, *op. cit.*, págs. 2–3.

Según el testimonio del demandado y el examen manual practicado por éste momentos antes de realizar la episiotomía, en ese momento la paciente presentaba un cuerpo perineal de un ancho normal, el bebé venía en una posición *vertex* y era un bebé de tamaño normal. Véase Transcripción de evidencia, pág. 260. Del expediente médico del hospital surge que transcurrieron quince (15) minutos desde que se practicó la episiotomía medial hasta el alumbramiento. El demandado también declaró que al momento del parto la demandante no siguió sus instrucciones y pujó descontrolada e irregularmente lo que produjo la laceración al esfínter. Este testimonio no le mereció credibilidad al tribunal de instancia que, por el contrario, descansó en la opinión del perito de la parte demandante.

El perito de la parte demandante indicó que la demandante tenía un área perineal pequeña y estrecha por lo que era contraindicado practicar una episiotomía en la línea media. Además, señaló que la posición que presentaba el bebé al momento del alumbramiento era una posterior derecha lo que creaba mucha tirantez a los músculos de esa área perineal por lo que "se prefiere hacer una episiotomía medio lateral, para evitar laceraciones o roturas o cortad[u]ras accidentales de la vagina o del esfínter del ano como ocurrió en [e]ste caso". T.E., pág. 165. Sin embargo, a preguntas del abogado de la parte demandada, este perito tuvo que aceptar que al momento de examinar el cuerpo perineal de la paciente y determinar que era pequeño, ya para ese entonces la demandante había sufrido dos (2) operaciones en dicha área. Definitivamente el área perineal no era la misma que existía al momento del alumbramiento.

Por otro lado, el tribunal de instancia concluyó que el expediente que se levantó en la sala de obstetricia contenía serias omisiones sobre la laceración de tercer grado que había sufrido la demandante, ya que esto representaba una complicación quirúrgica. Las laceraciones de tercer grado se definen como aquellas que se extienden a través

de la piel, de la membrana mucosa y de la masa perineal hasta el esfínter anal. No es infrecuente que estas laceraciones de tercer grado se extiendan también cierta distancia hacia adentro hasta la pared anterior del recto. Véase *Conduct of Normal Labor and Delivery*, Cap. 17, pág. 429 (*Exhibit* Núm. I(a) de la parte demandada). Señala el tribunal de instancia que "[c]omo tal debe anotarse y documentarse en el r[é]cord de la paciente, describiendo las estructuras afectadas, el grado de afectación, si el esfínter anal y la mucosa rectal se afectaron y hasta qué grado. *En el r[é]cord [sic] de la co-demandante nada aparece*". (Énfasis suplido.) Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho y Sentencia, págs. 15–16.

■    Es norma imperante en nuestra jurisdicción que los expedientes médicos tienen que llenarse de forma adecuada, de suerte que a la hora de examinar las actuaciones médicas podamos conocer mejor la situación del paciente a través de todo el tratamiento. Claro, las omisiones no necesariamente constituyen negligencia *per se*. Sin embargo, dicha omisión puede ser un factor a considerarse en la credibilidad del médico en cuanto al tratamiento brindado por éste. *Rodríguez Crespo v. Hernández*, supra, pág. 661; *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984).

Nos parece sorprendente y arbitraria la manera en que el tribunal de instancia llega a esta conclusión de derecho. De una simple lectura del expediente médico, notamos que en la página titulada *Obstetrical record* aparece escrito por el médico demandado lo siguiente: *Third–Degree Laceration Repaired Adequately*. En otra página de dicho expediente médico titulada *Physician's Progress Notes*, con fecha de 3 de febrero de 1986, el médico anotó lo siguiente:

Post Partum Progress.—Under sterile and controlled condition with the patient in the lithotomy and satisfactory local anesthesia with a median episiotomy was delivered vaginally a single living a term baby male in VX ROP Apgn 8–9 wt 7.10 pr lenght 21. Patient had a third-degree laceration that was sutu-

red adequately, the laceration of the anal sphinter was sutured with 3 interrupted stitches of chromic catgut O, the vaginal mucosa with a continuos suture of chromic catgut OO, the fascia and wound of the perineon with 4 interrupted stitches of chromic OO and the superficial fascia and area with a continous suture of chromic OO, subcuticular.

No nos cabe duda que el demandadò cumplió con su responsabilidad de anotar en el expediente médico la complicación quirúrgica habida en el área perineal dela demandante. Surge claramente que González Nápoles identificó la laceración y procedió a reparar adecuadamente.[4] No existen omisiones serias en el expediente médico que revelen que el demandado incumplió con el deber de anotar información médica sobre el tratamiento y diagnóstico ofrecido.

Ahora bien, una vez finalizada la reparación de la laceración, Ramos Robles quedó recluida en el hospital por los próximos dos (2) días. Surge del expediente médico del hospital estipulado por las partes, como del propio testimonio de la demandante, que durante su estadía en el hospital nunca informó ni se quejó al doctor García Vicario ni a las enfermeras que sufría de incontinencia fecal. T.E., pág. 57. Sólo se lo dijo a su esposo, quien tampoco se lo informó al médico. En cuanto a las evacuaciones, surge del mismo expediente que el 5 de febrero la paciente evacuó por primera vez desde la reparación del área perineal. Sin embargo, no existe anotación que Ramos Robles informara que esta evacuación fue por incontinencia fecal.

Fue precisamente el 5 de febrero que la paciente fue dada de alta por el doctor García Vicario. El tribunal de instancia concluyó que fue dada de alta "sin recomendaciones específicas, aparte de ordenarle una crema 'dermoplast' ". Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho y Sentencia, pág. 7. El propio tes-

---

[4] La parte demandante no pudo demostrar que la reparación efectuada no fue la correcta. El perito de la parte demandada señaló que la técnica y los materiales utilizados fueron los correctos. T.E., pág. 347.

timonio de Ramos Robles no es compatible con dicha determinación. La demandante dijo que además de prescribirle dicha crema, èl doctor García Vicario le indicó que se pusiera una lámpara de cinco a diez minutos cada día en el área afectada. T.E., pág. 14. El uso de esta lámpara está reconocido por las autoridades médicas para el cuidado de la episiotomía, específicamente para mantener el área seca. Véase Buxton and Muram, *op. cit.*, pág. 9; *Williams on Obstetrics Gynecology*, 16ta ed., pág. 432 (*Exhibit* Núms. 1(a) y (d) de la parte demandada). Por otra parte, a preguntas del abogado de la parte demandada sobre si le habían dado instrucciones sobre el aseo que debía darse después del parto, Ramos Robles contestó que sí, que le habían dado esas instrucciones. T.E., págs. 69 y 70.

También le mereció credibilidad al tribunal de instancia el testimonio pericial de la parte demandante respecto al uso de antibióticos como medida para prevenir complicaciones luego de realizar la episiotomía. Este perito indicó que debieron recetarle antibióticos a la demandante para evitar infecciones en el área perineal reparada.

Al examinar la transcripción de evidencia y la prueba documental, nos percatamos de que esta conclusión pericial no está sustentada por las autoridades médicas en el campo de la obstetricia y la ginecología. No obstante, cuando este perito fue confrontado por la parte demandada sobre el por qué era necesario el uso de antibióticos, él se limitó a decir que los tratadistas sólo son utilizados por hospitales para establecer un método de tratamiento. Más adelante le dijo al abogado de la parte demandada que "[l]os tratadistas que usted me ha enseñado hasta ahora deberían volver a leer sus tratados, para que hagan las cosas bien". Véase T.E., págs. 225 y 231.

Somos del criterio que ante esta situación no se le puede imputar negligencia a la parte demandada, toda vez que se trata de una duda fundamentada y razonable sobre el uso de antibióticos como medida profiláctica luego de practicar

una episiotomía. *Oliveros v. Abréu*, supra, pág. 228; *Rodríguez Crespo v. Hernández*, supra, pág. 649. Véase *Williams on Obstetrics and Gynecology, op. cit.* (*Exhibit* Núm. 1(a) de la parte demandada).

El tribunal de instancia determinó que fue a los dos (2) días después de haber sido dada de alta que Ramos Robles acudió a la oficina de los médicos y, luego de ser atendida por el doctor García Vicario, éste le indicó que ya no podía hacer nada y que la referiría a un grupo de proctólogos en la ciudad de Ponce. No le mereció credibilidad al tribunal la versión del doctor García Vicario a los efectos de haberse comunicado personalmente con el proctólogo Sánchez Gaetán para explicarle la condición de la paciente. Por el contrario, el tribunal concluyó que García Vicario le dio un simple referido por escrito[5] y le mereció credibilidad la versión de la demandante quien, según el tribunal, había negado que esta conversación telefónica se había llevado a cabo. Sentencia, pág. 8.

Al examinar la transcripción de evidencia nos percatamos que esta determinación es errónea. La propia demandante admitió que frente a ella el doctor García Vicario había llamado al doctor Sánchez Gaetán por teléfono para indicarle que iba a referirle una paciente. T.E., pág. 67. La demandante dijo que ese mismo día fue a ver al doctor Sánchez Gaetán.

Además, cometió error el tribunal de instancia al concluir que fue a los dos (2) días de haber regresado del hospital que Ramos Robles fue a ver al doctor García Vicario y al doctor González Nápoles. Del propio referido que le dio

---

[5] El referido hecho en una hoja del recetario de los demandados fue incluido como parte de la prueba estipulada. *Exhibit* 2. El mismo dispone como sigue:

"Nombre.—Hilda Ramos. Edad ____ Dirección ____ Fecha 2.13.86
To Dr. Armstrong
To Dr. Castillo
Dr. Serriol or Gaetán
26 y/o year/o Female patient who had recent delivery on 2/3/86, present fecal incontinence. Please evaluate.
Thanks, Dr. García Vicario." (Fdo.)

el doctor García Vicario y que fue estipulado por las partes, surge que fue el 13 de febrero de 1986 que la demandante visitó a este médico, esto es, ocho (8) días luego de haber sido dado de alta. Esto queda comprobado por el expediente médico de la paciente hecho por el doctor Sánchez Gaetán en el que se verifica la fecha de la primera visita. Este expediente médico también fue estipulado por las partes. *Exhibit* Núm. 2. Del mismo expediente surge que la paciente sufría en ese momento de una seria infección, por lo que no podía ser intervenida quirúrgicamente hasta que esta condición mejorara.[6]

Después de una evaluación cuidadosa de la prueba documental y la prueba pericial presentada, concluimos que el tribunal de instancia cometió graves errores en la apreciación de la prueba y sus conclusiones de derecho.[7] En un análisis sereno de la prueba, forzoso es concluir que la parte demandante no presentó evidencia que demostrara que el tratamiento y el cuidado médico que le ofrecieron los demandados, unidos a los alegados actos negligentes, fueron los factores que con mayor probabilidad causaron el daño. *Pérez Cruz v. Hospital de la Concepción,* supra; *Ríos v. Mark,* supra.

Al momento del alumbramiento no existía ninguna contraindicación que impidiera al doctor García Vicario utilizar su juicio profesional para escoger como mejor tratamiento para Ramos Robles la episiotomía en la línea media. En cuanto al tratamiento médico ofrecido, el tribunal de instancia concluyó que "conforme a la mejor práctica

---

[6] El perito de la parte demandada explicó que una infección en dicha área podría causar que se aflojen o se rompan las suturas y el tejido se ponga edematoso. T.E., pág. 353.

[7] Es evidente que el tribunal de instancia acogió un proyecto de determinaciones de hecho y de Derecho. En reiteradas ocasiones hemos dicho que los jueces deben tener mucho cuidado al aceptar y firmar estos proyectos de sentencia. Entendemos la carga de trabajo y la utilidad que estos proyectos de sentencia representan, pero no podemos olvidar que la función del juez al hacer un fino balance en la búsqueda de la verdad es insustituible. *Malavé v. Hospital de la Concepción,* 100 D.P.R. 55, 56 (1971); *Román Cruz v. Díaz Rifas,* 113 D.P.R. 500, 508 (1982); *Arroyo v. Rattan Specialties, Inc.,* 117 D.P.R. 35, 42 (1986).

de la medicina el episiotomía [en la línea media] no era la más recomendable en este caso y fue la que ocasionó la laceración de tercer grado y los daños posteriores". Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho y Sentencia, pág. 5. Añade que "[l]a más recomendable era la medio lateral por la posición en que venía el bebé y el área perineal estrecha de la demandante. Con la episiotomía medio-lateral *no hay el riesgo de interferir con el esfínter del ano"*. (Énfasis suplido.) Relación del Caso, Determinaciones de Hechos, Conclusiones de Derecho y Sentencia, pág. 4.

El demandado, al decidir cuál episiotomía era la más recomendable, utilizó su juicio profesional y experiencia al escoger la episiotomía en la línea media. No estamos de acuerdo con el tribunal de instancia que categóricamente aseveró que debió practicarle la espisiotomía mediolateral, ya que con ésta no existía el riesgo de interferir con el esfínter. Tanto la prueba pericial de ambas partes como la documental no sustentan dicha afirmación.

No se puede concluir, a la luz de la prueba presentada, que al utilizar la episiotomía mediolateral no se hubiera lacerado accidentalmente el esfínter como sucedió en este caso cuando se practicó la episiotomía en la línea media. Aun cuando el riesgo es menor, en la episiotomía mediolateral se puede lacerar también el esfínter. La prueba demostró que el bebé era de tamaño normal y que pesó siete (7) libras y diez (10) onzas. Este era un bebé más pequeño que el primero que la demandante tuvo y que había pesado siete (7) libras y catorce (14) onzas. En su primer parto también se le practicó una episiotomía en la línea media.

Por los fundamentos que anteceden, *concluimos que el tratamiento médico ofrecido por el demandado no está reñido con los estándares del cuidado médico que a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente en la ginecología y la obstetricia, satisfacen*

*las exigencias reconocidas en la profesión médica. Dada la conclusión a que llegamos, es innecesario discutir los demás errores alegados.*

*Se revoca la sentencia recurrida.*

El Juez Asociado Señor Negrón García emitió una opinión disidente.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

## I

No podemos suscribir la opinión mayoritaria. Ciertamente un error de juicio sobre el diagnóstico o tratamiento es una defensa válida "cuando las autoridades médicas están en desacuerdo sobre cuál es el diagnóstico o tratamiento adecuado". *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 731 (1983). Ese enfoque, simplemente reconoce la amplia discreción del médico cuando enfrenta una situación en la que cabe duda fundamentada y razonable sobre cuál curso seguir. *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721, 737 (1984); *López v. Hosp. Presbiteriano, Inc.*, 107 D.P.R. 197, 208 (1978); *Oliveros v. Abréu*, 101 D.P.R. 209, 228 (1973).

Sin embargo, esa no es la situación de autos; no estamos ante una diferencia de criterios en cuanto al tratamiento a seguirse. De entrada aclaramos que una *episiotomía* es una incisión en los tejidos de la vulva para facilitar el proceso de alumbramiento vaginal y proteger el perineo. Buxton and Muram, *Episiotomy*, en Sciarra: *Obstetric and Gynecology*, Vol. 2, Cap. 69, pág. 1. La episiotomía en la línea *media* se practica a lo largo del perineo desde el introito hasta, pero sin incluir, el músculo externo del esfínter del

ano. Buxton and Muram, *op. cit.*, pág. 2. La mediolateral comienza en la horquilla posterior hacia abajo en un ángulo aproximadamente de cuarenta y cinco (45) grados con el eje del introito. Buxton and Muram, *op. cit.*, pág. 3. Y, como veremos, el momento en que se practica es *crucial*. Los beneficios e inconveniencias de ambas episiotomías demuestran que no estamos ante un error de juicio honesto y razonable. La de *línea media*, usada por el Dr. Raúl González Nápoles: (1) es más fácil de reparar; (2) cicatriza mejor; (3) resulta menos dolorosa; (4) en raras ocasiones causa dispareunia; (5) los resultados anatómicos son casi siempre excelentes; (6) la pérdida de sangre es menor; (7) *la extensión a través del esfínter anal hasta el recto es más común.* Por el contrario, la *mediolateral*: (1) es más complicada de reparar; (2) más difícil de sanar; (3) conlleva mayor dolor, incluso en días posteriores; (4) la dispareunia suele ser más frecuente; (5) los resultados anatómicos resultan imperfectos en un diez por ciento (10%) de los casos; (6) conlleva mayor pérdida de sangre, pero (7) *la extensión a través del esfínter rara vez ocurre. Williams on Obstetrics and Gynecology*, 16ta ed., pág. 431.

Si efectivamente la episiotomía en la *línea media* conlleva todos estos beneficios, ¿por qué la *mediolateral*, con todas sus posibles desventajas, sigue considerándose una alternativa? La contestación es sencilla: ambas están visualizadas para circunstancias distintas, siendo *el factor determinante la probabilidad de daños al esfínter ante el cuadro peculiar que la paciente presente.* Aquí la episiotomía *mediolateral* debió usarse con la paciente Hilda A. Ramos Robles. Nos explicamos.

## II

*Primero*, la señora Ramos Robles tenía un área perineal pequeña. Aparte del testimonio a estos efectos de su perito, Dr. Juan J. Hernández Cibes, la propia prueba documental

presentada por los demandados Dres. José A. García Vicario y Raúl González Nápoles señala que el tamaño del área perineal está relacionado con la probabilidad de que una laceración de tercer grado tenga lugar; mientras menor el tamaño, mayor la probabilidad. *Williams on Obstetrics and Gynecology, op. cit.*([1]) En el caso de autos, la señora Ramos Robles sufrió una laceración de tercer grado al practicársele la episiotomía, lo cual nos sirve para demostrar el tamaño del área perineal, reconociendo, claro está, que ello necesariamente no tiene que ser la única causa por la cual ocurrió, pero tiende a corroborar lo declarado por el doctor Hernández Cibes.

*Segundo*, conforme el récord médico, el bebé venía en *posición vertex, occipitoposterior derecha* (ROP). Ante esa circunstancia, el proceso dejó de ser un nacimiento *por extensión* y resultó uno *por flexión*, poniendo mayor tirantez a los músculos que forman el peine. Ello significa que no debió hacerse la episiotomía en la *línea media* porque se prestaba y aumentaba la probabilidad de un desgarre o rotura, *como efectivamente ocurrió*. El uso de la episiotomía *mediolateral* para nacimientos en que se presenta el occipucio en posición posterior es reconocido como el adecuado. *Williams on Obstetrics and Gynecology, op. cit.*

Y *tercero*, en el primer parto de la señora Ramos Robles se le practicó una episiotomía en la *línea media*. Ese hecho, en lugar de llevarnos a pensar que era el procedimiento más apropiado para un segundo alumbramiento, denota la

---

([1]) Dicha autoridad expone:

"Con una adecuada selección de casos, es posible asegurar las ventajas de la episiotomía en la línea media y a la misma vez reducir a un mínimo su única desventaja: el riesgo mayor de que ocurra una extensión de tercer grado. *El tamaño de la masa perineal está relacionada con la posibilidad de que ocurra una laceración de tercer grado*, puesto que el accidente *está más propenso a ocurrir si la masa perineal es corta*. La posibilidad de que ocurra extensión de la episiotomía en la línea media hacia el esfínter rectal es también mucho mayor cuando el feto es grande, cuando *la presentación es de tipo occipitoposterior*, en partos que requieren la aplicación de fórceps medios y en presentaciones de nalgas. *Generalmente constituye una buena práctica utilizar la episiotomía mediolateral en las circunstancias mencionadas* y utilizar la incisión en la línea media en otras circunstancias." (Énfasis y traducción nuestros.)

existencia de una cicatriz susceptible a desgarrarse hasta el área del esfínter. *Así lo reconocieron los peritos de ambas partes*. T.E., págs. 170 y 343. Tal y como aconteció en *Pérez Cruz v. Hosp. La Concepción*, supra, pág. 737, "[e]l daño causado 'pudo razonablemente haberse previsto y evitado' ... los síntomas no eran obscuros (*obscure symptoms*) en que se puede caer, sin responsabilidad, por un error de diagnóstico. ... Aquí no se observó un grado razonable de cuidado al realizar un examen completo del paciente ... ni 'esfuerzo concienzudo' ".

Es normal que la episiotomía en la *línea media*, por las ventajas que conlleva, tienda a practicarse con mayor frecuencia. Sin embargo, no es permisible convertirla en una rutina, *ignorándose* las condiciones peculiares de cada embarazo.

## III

Asumiendo como correcta la conclusión mayoritaria de que la decisión médica de realizar la episiotomía en la *línea media* pudiese catalogarse como error de juicio honesto y razonable, aún así subsistiría responsabilidad por *la manera en que se practicó.*

Según indicado, *el momento de la episiotomía es crucial para el resultado que se espera*; la técnica es una incisión en el perineo para evitar estiramiento excesivo de los tejidos en el proceso de alumbramiento a causa de un trauma incontrolado; ese momento es cuando el bebé está por nacer dentro de las siguientes tres (3) o cuatro (4) contracciones. Buxton and Muram, *op. cit.*, pág. 2. De hacerse muy tarde (una vez coronada la cabeza del bebé), los músculos del perineo habrán estirado excesivamente derrotándose los objetivos de la operación. *Williams on Obstetrics and Gynecology, op. cit.*, pág. 430. Así ocurrió en este caso: como resultado de la episiotomía *tardía* hubo un parto abrupto que incluyó laceraciones de tercer grado.

Buxton and Muram, *op. cit.*, págs. 3–4, exponen, entre los factores iatrogénicos asociados con las laceraciones, el manejo de los fórceps, *tardanza al practicar la episiotomía* o el uso de una episiotomía *inadecuada*, alumbramientos descontrolados.

La *demora* en practicarla en la línea media, unido a la falta de atención por parte del doctor González Nápoles al no tomar en cuenta las posibles complicaciones anticipables que pudieron prevenirse en el proceso de alumbramiento, configuran negligencia. *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762, 787 (1987). No se le brindó a la paciente el grado de atención que a la luz de los modernos medios de comunicación y enseñanza satisfacen las exigencias reconocidas por la propia profesión médica. *Riley v. Rodríguez de Pacheco*, supra, págs. 797–798; *Negrón v. Municipio de San Juan*, 107 D.P.R. 375, 377 (1978); *González v. E.L.A.*, 104 D.P.R. 55, 59–60 (1975); *Morales v. Hosp. Matilde Brenes*, 102 D.P.R. 188, 194 (1974); *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973).

Finalmente no hay prueba que demuestre que a la señora Ramos Robles se le explicó la laceración que sufrió, ni las complicaciones de infecciones, incontinencia, etc., a que estaría expuesta. Curiosamente el referido dirigido a la oficina del proctólogo Dr. Felipe Sánchez Gaetán *en ningún lugar indica la laceración ocurrida.*(²)

En conclusión, la negligencia del doctor González Nápoles fue practicar tardíamente la episiotomía en la línea media; la del doctor García Vicario, en darla de alta sin expli-

---

(²) Dispone:

"Nombre.—Hilda Ramos. Edad ____ Dirección ____ Fecha 2.13.86
To Dr. Armstrong
To Dr. Castillo
Dr. Serriol or Gaetán

26   y/o year/o Female patient who had recent delivery on 2/3/86, present fecal incontinence. Please evaluate.

Thanks, Dr. García Vicario." (Fdo.)

carle las complicaciones que podían surgir como consecuencia de la laceración de tercer grado sufrida.