# 2008 DTA 68

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE SAN JUAN**
**PANEL VI**

CARMEN BATISTA DÍAZ VDA. DE OJEDA Y OTROS
Apelantes

v.

DR. JUAN LLOMPART ZENO Y OTROS
Apelados

Núm. KLAN-07-01428

San Juan, Puerto Rico, a 2 de mayo de 2008

Panel integrado por su Presidente, el Juez Brau Ramírez,
el Juez Cortés Trigo y la Juez García García

Brau Ramírez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

### I

Se trata de una demanda por daños y perjuicios por mala práctica de la medicina instada por los apelantes, herederos del Sr. Manuel Ojeda López ante el Tribunal de Primera Instancia, Sala Superior de San Juan. **[1]** La demanda está basada en la muerte del Sr. Ojeda, ocurrida el 5 de febrero de 1993, luego de que recibiera tratamiento en el Hospital Auxilio Mutuo en Río Piedras.

Las partes demandadas son la Sociedad Española de Auxilio Mutuo y Beneficencia de Puerto Rico (*"Auxilio Mutuo"*), encargada de la administración del Hospital, la compañía aseguradora de ésta, Evanston Insurance Company (*"Evanston"*), los Dres. Juan Llompart Zeno, Ricardo Miranda, Arturo Ydrach y Nicolás Betancourt, sus respectivas esposas y sociedades de bienes gananciales, y el Sindicato de Aseguradores para la Suscripción Conjunta de Responsabilidad Profesional Médico Hospitalaria (*"SIMED"*).

Durante el trámite del caso, se desestimó sumariamente la demanda contra el Dr. Ydrach y contra su esposa, dictamen que fue confirmado por este Tribunal mediante sentencia emitida el 26 de noviembre de 1997, en el caso KLAN-2007-01002. Los apelantes desistieron de su reclamación contra el Dr. Betancourt y su esposa. Los demás demandados son los apelados en este recurso.

El 15 de agosto de 2007, a base de la prueba desfilada en el juicio del caso, el Tribunal de Primera Instancia emitió la sentencia apelada y declaró no ha lugar la demanda, al concluir que los apelantes no habían establecido que la muerte del Sr. Ojeda fue provocada por la negligencia de los apelados.

Confirmamos.

### II

Para la fecha de los hechos, el causante de los apelados tenía 88 años y estaba gravemente enfermo de cáncer. **[2]** Se le había descubierto además un aneurisma en la aorta.

El 27 de diciembre de 1992, el Sr. Ojeda fue llevado de emergencia por sus familiares al Hospital Auxilio

Mutuo, del cual había sido socio por muchos años, porque tenía un fuerte dolor en el pecho y dificultad para respirar. El causante permaneció hospitalizado hasta el 31 de diciembre de 1992. Fue atendido por los Dres. Ydrach y Betancourt, quienes ordenaron que se le realizaran numerosos exámenes para determinar su condición.

El Sr. Ojeda también fue sometido a otros estudios en enero de 1993, incluyendo estudios de radiografía, CT Scan y una broncoscopía para una biopsia del tejido de sus pulmones. En este período, el causante fue atendido en las clínicas externas del Hospital por el Dr. Llompart, quien es especialista en medicina interna, neumología y cuidado crítico (*"critical care"*). El Dr. LLompart atendió al causante los días 12, 15 y 19 de enero de 1993 y le realizó la broncoscopía mencionada.

Como resultado de los estudios realizados, se determinó que el Sr. Ojeda tenía un cáncer del pulmón. El tumor tenía 3 centímetros, lo que refleja un estado avanzado. De acuerdo a la prueba desfilada ante el Tribunal de Primera Instancia, el único tratamiento efectivo para esta condición, hubiera sido operar al paciente. No obstante, ello no era posible en el caso del Sr. Ojeda debido a su edad y su condición física. En ese momento, el Sr. Ojeda tenía una expectativa de vida de aproximadamente cuatro meses. El Dr. Llompart lo refirió a un oncólogo.

El CT Scan tomado al Sr. Ojeda en enero de 1993 también confirmaba que éste tenía un aneurisma aórtico.

De este modo, para enero de 1993, el Sr. Ojeda tenía enfisema o enfermedad pulmonar obstructiva crónica (*"Cronical Obstructive Pulmonary Disease"* o *"COPD"*), con esputos crónicos de sangre. El Sr. Ojeda también tenía enfermedad cardiaca arteriosclerótica.

Entre enero y febrero de 1993, el causante sufrió tres incidentes de asfixia y tuvo que recibir respiración de boca a boca por parte de sus hijos.

El 3 de febrero de 1993, en horas de la mañana, los apelantes llevaron al causante al Hospital, debido a que éste manifestaba dolor de pecho y dificultad respiratoria, la que le había aquejado por las últimas dos semanas. [3] La temperatura, pulso y presión arterial del causante eran normales, pero su respiración mostraba un ritmo acelerado. El Sr. Ojeda fue ingresado al Hospital. Se le ordenaron laboratorios (CBC) y placas de pecho, así como oxígeno por una cánula. También se ordenó que se le administrase suero por vena.

Al momento de su admisión, el Sr. Ojeda no presentaba una condición aguda, si bien había estado crónicamente enfermo. En ese momento, no tenía fiebre, lo que era indicativo de que no tenía pulmonía.

Al día siguiente, se consultó al Dr. Miranda, quien es especialista en medicina interna. El Dr. Miranda examinó al causante aproximadamente a las 2:30 p.m. Para esa fecha, al causante se le había realizado una prueba de gases arteriales, que había resultado normal.

El Dr. Miranda encontró que el causante tenía broncoespasmos y que su condición era delicada. El Dr. Miranda ordenó que se comenzara una terapia respiratoria con un bronco dilatador y le recetó Cardicem para la angina de pecho. Dispuso que se redujera la dosis del medicamento que el causante estaba tomando para la presión, el que podía tener el efecto de contraer los bronquios. El Dr. Miranda ordenó que se consultara al Dr. Llompart.

Además de lo anterior, el Dr. Miranda dispuso que al paciente se le realizaran nuevos laboratorios (CBC), urinalisis y un SMAC23. También ordenó que se le tomaran los signos vitales cada cuatro horas y que se vigilaran sus niveles de entrada y salida de líquidos.

El Dr. Miranda consideró que su condición podía deberse a su cáncer del pulmón o a una posible pulmonía. Entendió que el diagnóstico era reservado por las características del paciente.

La consulta al Dr. Llompart fue ordenada por el Dr. Miranda a las 3:00 p.m. del 4 de febrero de 1993. No se indicó que fuese de emergencia. Conforme a las normas vigentes en el Hospital, las consultas regulares debían ser contestadas dentro de 24 horas. El Dr. Llompart no fue notificado de la consulta de forma inmediata.

El paciente recibió una terapia respiratoria el 5 de febrero de 1993, a las 7:40 a.m. En ese momento, tenía un pulso normal. Su respiración también era normal en ese momento.

El Dr. Miranda vio al causante nuevamente ese día, como a las 9:50 a.m. Los ronquillos de los pulmones eran escasos y el ritmo del corazón era regular. El Dr. Miranda entendió que el causante había desarrollado una hipoxemia (insuficiencia de oxígeno) severa que se había mejorado gracias a las medidas de apoyo brindadas al causante (terapia respiratoria y oxígeno).

Esa mañana, el Hospital notificó al Dr. Llompart de la consulta solicitada en la tarde del día anterior.

A las 2:15 p.m., las enfermeras llamaron al Dr. Miranda porque el causante había empeorado de momento. El causante se había puesto "*moteado*", esto es, tenía un aspecto morado en las áreas distales bajas, lo que reflejaba una pobre oxigenación en las extremidades. Sus respiraciones habían aumentado a 52 y su pulso se había reducido a menos de 60. El paciente se puso crítico súbitamente. Su respiración demostró que tenía un bronco espasmo severo. Se le proveyó terapia respiratoria.

El Dr. Miranda se comunicó con el Dr. Llompart y le informó de la condición del paciente, la cual era de deterioro. El Dr. Llompart llegó pocos minutos después, a las 3:00 p.m. y examinó al causante. En ese momento, el causante tenía tos seca, no tenía fiebre y expectoraba sangre. Tenía los glóbulos blancos altos y los glóbulos rojos disminuidos. La hemoglobina se había reducido a 11.4. Los hematocritos eran bajos y las plaquetas aparecían elevadas. El cuadro era compatible con el diagnóstico de cáncer del paciente.

El Dr. Llompart examinó la radiografía tomada al causante, la que estaba entrenado para interpretar, [4] y apreció nuevamente el tumor que éste tenía en el pulmón. No observó que hubiera infiltrados en el pulmón. El causante no tenía fiebre ni se venía tóxico. La oxigenación no aparecía baja y su respiración no mostraba estar acelerada. El paciente tampoco tenía fiebre, por lo que el Dr. Llompart no consideró que tuviese pulmonía.

El Dr. Llompart ordenó que se le repitiera el CBC. Pensó que el causante podía tener shock hemorrágico o una sepsis y ordenó que se le administrase un antibiótico de amplio espectro. Hasta ese momento, al paciente no se le habían administrado antibióticos. [5] El Dr. Llompart entendió que el paciente también podía tener una embolia y ordenó que se le suministrara un diurético, bicarbonato y heparina. Esta última es un anticoagulante dirigida a contrarrestar cualquier embolia. También se ordenó que se le realizara otra prueba de hemoglobina.

Luego de administrarle los medicamentos, el Dr. Llompart fue a hablar con los apelantes. Les explicó que la condición del causante era crítica. Éstos decidieron que no se entubara y que no se tomaran medidas de resucitación.

Poco después, el causante se fue en shock. Falleció a las 5.15 p.m.

Al causante no se le realizó una autopsia, por lo que se desconoce a ciencia cierta la causa de su muerte. El récord refleja, sin embargo, que éste sufrió una baja súbita en hemoglobina, hasta llegar a un nivel incompatible con la vida, lo que es reflejo de una posible hemorragia interna. En el juicio, la parte apelada opinó que ello probablemente había sido causado por una ruptura del aneurisma que tenía el paciente y que le había sido

previamente diagnosticada. La ruptura fue posiblemente provocada por el esfuerzo que hacía el paciente para poder respirar.

Con posterioridad al deceso del paciente, se produjo una lectura por el radiólogo de la placa de pecho que se había tomado la paciente, la que opinaba que el causante tenía una pulmonía doble. La lectura opina que el paciente tenía infiltrados en el pulmón derecho.

La parte apelada alega que esta opinión es incorrecta, por varios factores. La masa observada en el pulmón del causante en la radiografía ya había sido detectada e identificada como un tumor canceroso hacía un mes mediante la prueba de CT Scan, que es más precisa que una placa de rayos X. [6] Aunque tenía los glóbulos blancos elevados, el causante no tenía fiebre. Su tos era seca y tenía esputos sanguinolentos, los que eran incompatibles con una pulmonía. (Los esputos asociados a una pulmonía hubieran debido ser purulentos, no sanguinolentos). Los síntomas del paciente eran compatibles con la condición de cáncer de su pulmón y no con una pulmonía.

Tampoco está claro que de haber sufrido una pulmonía, la administración previa de antibióticos hubiera evitado el desenlace eventual. La prueba reflejó que existe una divergencia de criterios entre la comunidad médica sobre la deseabilidad de administrar antibióticos a un paciente con las características del causante, de forma agresiva, sin previamente verificar su diagnóstico.

Si el causante efectivamente sufrió de la ruptura de su aneurisma, la administración de heparina, según lo ordenó el Dr. Llompart, era contraindicada. El 5 de febrero de 1993, posterior a la muerte del Sr. Ojeda, el Dr. Miranda y el Dr. Llompart recibieron los resultados del último CBC ordenado, que reflejaba el dramático descenso en la hemoglobina del paciente. Los apelantes no tuvieron esta información al momento de la crisis, a las 3:00 p.m. En ese momento, según hemos indicado, el Dr. Llompart sospechó que la condición del causante podía deberse a una embolia, la que no era inconsistente con sus síntomas.

Aunque el paciente probablemente falleció de una ruptura de su aneurisma, no tuvo sangrado exterior visible, por lo que los médicos no tuvieron aviso de su condición.

Oportunamente, en 1994, la parte apelante instó la presente demanda por daños y perjuicios por mala práctica de la medicina ante el Tribunal de Primera Instancia contra los apelados y las otras partes mencionadas. En su demanda, los apelantes alegaron que los apelados incurrieron en impericia médica en su tratamiento al Sr. Ojeda y que ésta fue la causa de su deceso. Los apelantes solicitaron compensación por los daños sufridos por ellos.

Los apelados comparecieron separadamente, contestaron la demanda y negaron las alegaciones. El 28 de mayo de 1997, el Tribunal de Primera Instancia emitió sentencia sumaria parcial en la que desestimó la demanda contra el Dr. Ydrach y la esposa de éste. Este dictamen, según hemos indicado, fue confirmado por este Tribunal en el recurso KLAN-2007-01002.

Luego de otros trámites, el Tribunal de Primera Instancia celebró la vista en su fondo del caso. Las partes presentaron evidencia testifical, documental y pericial en apoyo de sus respectivas posiciones. Al inicio del juicio, los apelantes informaron que desistían de su demanda contra el Dr. Betancourt y la esposa de éste.

Luego de escuchada la prueba, el 15 de agosto de 2007, el Tribunal de Primera Instancia emitió la sentencia apelada y declaró sin lugar la demanda.

En su sentencia, el Tribunal confirió credibilidad a la prueba pericial presentada por la parte apelada y concluyó que la muerte del Sr. Ojeda no era atribuible a la negligencia de dicha parte.

El Tribunal determinó que la preponderancia de la prueba establecía que el causante probablemente falleció por la ruptura de su aneurisma y no debido a una pulmonía. El Tribunal entendió que los síntomas del causante eran más bien consistentes con su condición de cáncer del pulmón y no atribuibles a pulmonía, como lo sugería la lectura de la placa hecha por el radiólogo. El Tribunal entendió, en este sentido, que el causante no había tenido fiebre durante su hospitalización y que sus síntomas de tos seca y esputos sanguinolentos eran también inconsistentes con la presencia de una pulmonía.

El Tribunal consideró que, en cualquier caso, la decisión de los apelados de no administrarle antibióticos de primera intención era una sobre la que existía una razonable diferencia entre las autoridades médicas. El Tribunal expresó:

*"En conclusión, el cuadro clínico que presentaba el señor Ojeda López en su hospitalización de febrero de 1993, unido a su historial, justificaba el diagnóstico de cáncer y no el de pulmonía. Los laboratorios y las pruebas realizadas confirmaban el diagnóstico de cáncer. Por tanto, el diagnóstico estaba razonablemente justificado a base del cuadro clínico y el tratamiento brindado llenó las exigencias aceptadas como correctas por la profesión médica.*

*Aun cuando pudiéramos concluir que el cuadro clínico pudiera dar espacio para un diagnóstico de pulmonía, lo cual entendemos que no fue así, el propio perito de la parte demandante estableció que existe divergencia de opiniones en la comunidad médica en cuanto a la administración de antibióticos. Por ende, a lo sumo estaríamos ante un caso de error honesto de juicio, el cual es eximente de responsabilidad".*

El Tribunal también determinó:

*"De las muestras de tejido y líquido (células sueltas) que tenía el doctor Llompart de la broncoscopía de enero de 1993, ninguna tenía resultado positivo a pulmonía. El tumor del señor Ojeda creció rápidamente en un mes, causó la inflamación, obstruyéndole el paso del aire y junto con su historial de enfisema le ocasionaba dificultad para respirar. Los análisis de los resultados de la broncoscopía, así como los niveles de leucositosis reportados en el hospital del día 4 de febrero de 1993 con un aumento significativo en los glóbulos blancos de la sangre, hicieron del diagnóstico de cáncer del pulmón avanzado el más correcto.*

*Examinado el historial del paciente, los resultados de laboratorio post-mortem, la causa más probable de la muerte del señor Ojeda se debió a un shock hipovolémico que sufrió el paciente cuando el aneurisma diagnosticada alrededor de un año antes rompió, perdiendo el paciente alrededor de la mitad de la sangre de su cuerpo sin surgir ella exteriormente (que pudiera notarse por algún médico o enfermera). Aun asumiendo que el paciente tuviera pulmonía el 4 de febrero y asumiendo también que se le administraran los antibióticos que correspondía si era bacteriana, ello no hubiera cambiado el desenlace final, porque el antibiótico no hubiera tenido efecto alguno ante la presencia del aneurisma que tenía el señor Ojeda.*

*... El deterioro del paciente no fue por una causa identificable. Fue muy súbito e inevitable."*

El Tribunal entendió que los apelados no habían actuado de forma negligente al suministrar heparina al paciente al desarrollarse la crisis del 5 de febrero de 1993 a las 3:00 p.m. Aunque este tratamiento era contraindicado, el Tribunal expresó que en ese momento los apelantes no podían conocer que el paciente sufría de una hemorragia interna.

El Tribunal entendió que el Dr. Llompart había contestado la consulta dirigida a él, el 5 de febrero de 1993, esto es, poco tiempo después de que le fuera notificada y dentro de las 24 horas de formulada la consulta. Concluyó que el apelado no había incurrido en negligencia en el tratamiento del paciente.

El Tribunal declaró sin lugar la demanda.

Los apelantes solicitaron determinaciones adicionales de hechos, que fueron denegadas por el Tribunal el 29 de agosto de 2007. Los apelantes también solicitaron reconsideración, que fue rechazada por el Tribunal mediante resolución emitida el 20 de septiembre de 2007.

Insatisfechos, los apelantes acudieron ante este Tribunal.

## III

En su recurso, los apelantes plantean que el Tribunal de Primera Instancia erró al declarar sin lugar la demanda y al concluir que los apelados no incurrieron en negligencia o que, de haberlo hecho, ésta no contribuyó a la muerte del causante.

En nuestra jurisdicción, según se conoce, la responsabilidad civil resultante de actos u omisiones culposas o negligentes está regida por el Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141, que establece que el que por acción u omisión cause daño a otro, mediante culpa o negligencia, viene obligado a reparar el daño causado.

El Tribunal Supremo de Puerto Rico ha aclarado que para que exista responsabilidad bajo dicho precepto, es necesario que concurran los siguientes elementos: (1) un daño, (2) una acción u omisión negligente, y (3) la relación causal entre el daño y la conducta culposa o negligente. *Rivera v. S.L.G. Díaz*, 165 D.P.R. ___ (2005), **2005 J.T.S. 121,** a la pág. 57; *Montalvo v. Cruz*, 144 D.P.R. 748, 755 (1998); *Toro Aponte v. E.L.A.*, 142 D.P.R. 464, 473 (1997); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294, 308 (1990).

La culpa o negligencia consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación, correspondiendo tal diligencia a las circunstancias de las personas, del tiempo y del lugar. La diligencia exigible en estos casos es la que correspondería ejercitar a un buen padre de familia o un hombre prudente y razonable. *Toro Aponte v. E.L.A.*, 142 D.P.R.____, a la pág. 473; *Elba A.B.M. v. U.P.R.*, 125 D.P.R.____, a la pág. 309.

Para determinar si una omisión es generadora de responsabilidad, se considera: (1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, y (2) si de haberse llevado a cabo el acto omitido, el daño se hubiera evitado. *Toro Aponte v. E.L.A.*, 142 D.P.R.____, a la pág. 474.

No se responde por acontecimientos que no son razonablemente previsibles. *Toro Aponte v. E.L.A.*, 142 D. P.R.____, a la pág. 473; *Montalvo v. Cruz*, 144 D.P.R____, a la pág. 756.

En nuestro ordenamiento rige la teoría de causalidad adecuada para determinar la responsabilidad por los daños bajo el citado Artículo 1802. Según dicha doctrina, no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general. *Santiago v. Sup. Grande,* 166 D.P.R. ___ (2006), **2006 J.T.S. 21,** a la pág. 848; *Rivera v. S.L.G. Díaz,* **2005 J.T.S. 121,** a la pág. 57; *Montalvo v. Cruz,* 144 D.P.R. a la pág. 756; *Soc. de Gananciales v. Jerónimo Corp.,* 103 D.P.R. 127, 134 (1974).

El peso de la prueba para establecer la responsabilidad del demandado corresponde a la parte demandante. En materia de responsabilidad civil, el hecho productor del daño nunca se presume. El Tribunal Supremo de Puerto Rico ha aclarado que la mera ocurrencia de un daño, sin más, no puede constituir prueba concluyente de conducta antijurídica de la parte demandada. Quien alega que sufrió un daño por la negligencia de otro, tiene la obligación de poner al Tribunal en condiciones de poder hacer una determinación clara y específica sobre negligencia. *Colón y otros v. K-mart y otros*, 154 D.P.R. 510, 521 (2001); *Matos v. Adm. Servs. Médicos de P. R.*, 118 D.P.R. 567, 569 (1987); *Cotto v. C.M. Ins. Co.,* 116 D.P.R. 644, 651 (1985); *Vaquería Garrochales, Inc. v. A.P.P.R.,* 106 D.P.R. 799, 801 (1978).

En cuanto el grado de diligencia que deben observar los profesionales de la salud, el Tribunal Supremo ha establecido que los mismos están obligados a seguir las normas mínimas de cuidado, conocimiento y destrezas del *"profesional razonable"*. El contenido de esta obligación queda delimitado conforme al estado de conocimiento y práctica prevaleciente, que satisface las exigencias generalmente reconocidas por la referida profesión, a la luz de los modernos medios de comunicación y enseñanza. *Arrieta v. De la Vega*, 165 D.P.R. ___ (2005), **2005 J.T.S. 134**, a la pág. 168; *López v. Dr. Cañizares*, 163 D.P.R. ___ (2004), **2004 J.T.S. 165**, a la pág. 298; *Castro Ortiz v. Mun de Carolina*, 134 D.P.R. 783, 793 (1994); *Medina Santiago v. Vélez*, 120 D.P.R. 380, 384-385 (1988); *Zambrana v. Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 522 (1980); *Oliveros v. Abréu*, 101 D.P.R. 209, 226 (1973); véase, además, *Colón Prieto v. Géigel*, 115 D.P.R. 232, 239-240 (1984).

Para prevalecer en un caso contra un profesional de la salud, el demandante viene obligado a: (1) presentar prueba sobre las normas mínimas de conocimiento y cuidado aplicables al área en cuestión, (2) demostrar que el demandado incumplió con estas normas en el tratamiento del paciente, y (3) que esto fue la causa del daño sufrido por el paciente. Véanse, *Blás v. Hosp. Guadalupe*, 146 D.P.R. 267, 322 (1998); *Santiago Otero v. Méndez*, 135 D.P.R. 540, 549 (1994); *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639, 650 (1988); *Medina Santiago v. Vélez*, 120 D.P.R.____, a la pág. 385; *Matos v. Adm. Serv. Médicos de P.R.*, 118 D.P.R.____, a la pág. 569.

A los médicos y otros profesionales de la salud se les reconoce una amplia discreción profesional en su trabajo. No existe responsabilidad por impericia cuando el demandado se enfrenta a una situación en la cual cabe una duda educada y razonable sobre el curso de tratamiento a seguir y cuando las autoridades médicas están divididas sobre ese particular. En estos casos, la existencia de un error de juicio honesto y razonable en el tratamiento exime de responsabilidad, siempre y cuando el profesional de la salud haya realizado un esfuerzo razonable para enterarse y cerciorarse de los síntomas y de la condición del paciente y haya agotado los medios de diagnóstico a su disposición. *Arrieta v. De la Vega*, **2005 J.T.S. 134**, a la pág. 169; *López v. Dr. Cañizares*, **2004 J.T.S. 165**, a la pág. 298; *Santiago Otero v. Méndez*, 135 D.P.R.____, a las págs. 549-550; *Ramos, Escobales v. García, González*, 134 D.P.R. 969, 975 (1993); *Lozada v. E.L.A.*, 116 D.P.R. 202, 217 (1985); *Cruz v. Centro Médico de P.R.*, 113 D.P.R. 719, 729-730 (1983); *Oliveros v. Abréu*, 101 D.P.R.____, a la pág. 228.

Existe una presunción de que un profesional de la salud ha observado un grado razonable de cuidado y atención en la administración de tratamiento y que los exámenes practicados al paciente han sido adecuados. *Arrieta v. De la Vega*, **2005 J.T.S. 134**, a la pág. 169; *López v. Dr. Cañizares*, **2004 J.T.S. 165**, a la pág. 298; *Blás v. Hosp. Guadalupe*, 146 D.P.R.____, a la pág. 322; *Rodríguez Crespo v. Hernández*, 121 D.P.R____, a la pág. 650.

Corresponde a la parte demandante controvertir esta presunción mediante la prueba necesaria. *Arrieta v. De la Vega*, **2005 J.T.S. 134**, a la pág. 169; *López v. Dr. Cañizares*, **2004 J.T.S. 165**, a la pág. 298; *Blás v. Hosp. Guadalupe*, 146 D.P.R____, a la pág. 322; *Ramos, Escobales v. García, González*, 134 D.P.R.____, a la pág. 976; *Rodríguez Crespo v. Hernández*, 121 D.P.R.____, a la pág. 650.

El demandante debe establecer, por preponderancia de la prueba, que las acciones negligentes del demandado fueron el factor que con mayor probabilidad ocasionó el daño sufrido. Véanse, *Blás v. Hosp. Guadalupe*, 146 D.P.R.____, a la pág. 322; *Ramos, Escobales v. García, González*, 134 D.P.R.____, a la pág. 976; *Rodríguez Crespo v. Hernández*, 121 D.P.R.____, a la pág. 650.

No es necesario, sin embargo, establecer este hecho con precisión matemática, ni eliminar toda otra posible causa del daño. *Sepúlveda de Arrieta v. Barreto*, 137 D.P.R. 735, 759-760 (1994); *Núñez v. Cintrón*, 115 D.P.R. 598, 616-617 (1984).

En cuanto a la responsabilidad que tienen los hospitales respecto a sus pacientes, la norma es que dichas instituciones le deben a sus pacientes aquel grado de cuidado que ejercería un hombre prudente y razonable en condiciones y circunstancias similares. *López y otros v. Dr. Cañizares*, **2004 J.T.S. 165**, a la pág. 298; *Blas v. Hosp. Guadalupe*, 146 D.P.R._____, a la pág. 323; *Márquez Vega v. Martínez Rosado*, 116 D.P.R. 397, 405 (1985); *Núñez v. Cintrón*, 115 D.P.R._____, a la pág. 613; *Crespo v. H.R. Psychiatric Hosp., Inc.*, 114 D.P.R. 796, 800 (1983); *Hernández v. La Capital*, 81 D.P.R. 1031, 1037-38 (1970).

De ordinario, lo que constituye o no una práctica profesional adecuada en un caso de impericia debe ser establecido mediante testimonio pericial. Véanse, *Ríos Ruiz v. Mark*, 119 D.P.R. 816, 828-829 (1987); *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871, 877 (1972); *Guzmán v. Silén*, 86 D.P.R. 532, 538 (1962).

Los tribunales de Primera Instancia gozan de una amplia discreción para evaluar este tipo de prueba y pueden adoptar su propio criterio o incluso descartarla, aunque resulte técnicamente correcta. *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.*, 150 D.P.R. 658, 662-663 (2000); *Culebra Enterprises Corp. v. E.L.A.*, 143 D.P.R. 935, 952 (1997); *Prieto v. Maryland Casualty Co.*, 98 D.P.R. 594, 623 (1970).

Por su parte, el tribunal apelativo se encuentra en la misma posición que el Tribunal de Primera Instancia para evaluar el testimonio de un perito y formular sus propias conclusiones. *Arrieta v. De la Vega*, **2005 J.T.S. 134**, a la pág. 169; *Ramos, Escobales v. García, González*, 134 D.P.R._____, a la pág. 976; *Ríos Ruiz v. Mark*, 119 D.P.R._____, a la pág. 820; *Cruz v. Centro Médico de P.R.*, 113 D.P.R._____, a la pág. 721.

En el presente caso, según hemos visto, el Tribunal de Primera Instancia determinó que los apelados no actuaron de forma negligente y que no fué su impericia la que ocasionó la muerte del causante de la parte apelante.

Hemos examinado el récord y entendemos que las determinaciones del Tribunal de Primera Instancia están razonablemente sostenidas por la prueba desfilada ante ese foro. La norma es que el Tribunal de Apelaciones no habrá de sustituir las determinaciones formuladas por el Tribunal de Primera Instancia a menos que éstas resulten claramente erróneas o sean producto de pasión, prejuicio o parcialidad. Véanse, *Rolón v. Charlie Car Rental, Inc.*, 148 D.P.R. 420, 433 (1999); *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8, 14 (1987); *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985); *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 451 (1985); *Quintana Tirado v. Longoria*, 112 D.P.R. 276, 292 (1982); Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2.

En el presente caso, la decisión del Tribunal está sostenida por la prueba pericial presentada por los apelados, así como por los testimonios de éstos. Es evidente, en este sentido, que el causante efectivamente tenía un cáncer en el pulmón, el que estaba relacionado a su padecimiento agudo de enfisema. Los apelados trataron esta condición, la que le fue estabilizada.

El deterioro súbito y muerte del paciente el 5 de febrero de 1993 no respondió a que los apelados hubieran omitido brindarle un cuidado razonable, sino que constituyó un desarrollo imprevisible, probablemente provocado por la ruptura de su aneurisma. En estas circunstancias, entendemos que los apelados no son responsables por el fallecimiento del Sr. Ojeda. [7]

Los apelantes insisten que el Sr. Ojeda falleció de pulmonía o de sepsis. Alegan que los apelados fueron negligentes al no administrarle antibióticos. Los apelantes señalan, en este sentido, que el causante tenía un contaje alto de glóbulos blancos desde su admisión, lo que debió alertar a los apelados de la presencia de una infección.

Lo cierto es que el récord sugiere que el apelante no tenía pulmonía. La prueba pericial presentada refleja que sus síntomas eran incompatibles con una pulmonía debido a que no tenía fiebre y sus esputos eran sanguinolentos.

Los resultados de las pruebas de gases arteriales fueron satisfactorios.

La prueba reflejó que tampoco existe un criterio unánime sobre si resulta indicado administrar antibióticos de forma preventiva a un paciente de la edad y con las características del Sr. Ojeda, sin haber precisado su diagnóstico, ya que este curso presenta riesgos para su salud. En estas circunstancias, no cabe imponer responsabilidad a los apelados por esta omisión. *Arrieta v. De la Vega*, 2005 **J.T.S. 134**, a la pág. 169; *López v. Dr. Cañizares*, 2004 **J.T.S. 165**, a la pág. 298; *Santiago Otero v. Méndez*, 135 D.P.R.____, a las págs. 549-550.

Tampoco está claro que la omisión de los apelados de suministrar antibióticos al causante hubiera tenido relación causal con su muerte, la que con toda probabilidad se debió a la ruptura de su aneurisma y hemorragia interna, según lo reflejó su súbito descenso de hemoglobina. *Blás v. Hosp. Guadalupe*, 146 D.P.R.____, a la pág. 322; *Rodríguez Crespo v. Hernández*, 121 D.P.R.____, a la pág. 650.

No entendemos que el Tribunal de Primera Instancia haya errado en su adjudicación de la controversia.

Por los fundamentos expresados, se confirma la sentencia apelada.

Lo pronunció y lo manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones

### ESCOLIOS 2008 DTA 68

1. Los sucesores del Sr. Ojeda López lo fueron su esposa Carmen Batista Díaz y sus hijos, Carmen, Manuel y Aníbal Ojeda Batista. Durante el trámite del caso, falleció la Sra. Batista. Fue sustituida por los apelantes.

2. El récord refleja que el causante había tenido más de 40 hospitalizaciones previas.

3. Según el testimonio de la apelante Carmen Ojeda Batista, ella se preocupó por la condición del causante y llamó al Dr. Llompart, quien le instruyó que llevaran al causante al Hospital al día siguiente y lo llamaran entonces. A pesar de que el causante fue llevado al Hospital ese mismo día, no se notificó de ello al Dr. Llompart.

4. El récord refleja que el Dr. Llompart estudió medicina en la Escuela de Medicina de la Universidad de Nueva York ("N.Y. U."). Hizo su residencia y especialidad en neumología en Baylor College en Tejas. Estudió en Suecia, donde condujo investigaciones. Posteriormente fue reclutado por la Universidad de Puerto Rico como catedrático en el área de neumología y medicina interna. También es "*Board Certified*". Luego trabajó en Hospitales privados. Hasta 1986, fue el jefe de la Unidad de Intensivo del Hospital Auxilio Mutuo.

5. La prueba reflejó que, debido a la edad y circunstancias del causante, la administración de antibióticos de amplio espectro era riesgosa porque, entre otros posibles efectos secundarios, este tipo de medicamento le podía provocar un fallo renal. También existía la posibilidad de que el uso prematuro de antibióticos resultara en que las bacterias que se deseaban combatir desarrollaran resistencia al medicamento.

6. En su lectura de la placa, el radiólogo no detectó la presencia de cáncer, por lo que el Tribunal de Primera Instancia entendió que era evidente que había confundido el tumor con una pulmonía.

7. En su recurso, los apelantes alegan que durante el juicio, la Juez que presidía la vista expresó que entendía que había actos de negligencia de los tres médicos demandados, pese a lo cual declaró sin lugar la demanda. El Tribunal apreció que, aunque al causante se le suministró heparina en la tarde del 5 de febrero de 1993, lo que era contraindicado, los apelados no estaban en posición de conocer lo anterior, ya que no contaban con los resultados del último CBC que se le tomó al causante. El Tribunal entendió que las medidas tomadas por los apelados para reaccionar a la crisis en la condición del paciente fueron adecuadas.