# 2008 DTA 100

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE ARECIBO**
**PANEL IX**

FELIPE CASTILLO VEGA POR SÍ, MARÍA DEL C. PÉREZ PÉREZ POR SÍ, Y AMBOS EN REP. DE LA SOC. LEG. DE GAN. QUE COMPONEN Y DE SU HIJO MENOR FELIPE D. CASTILLO PÉREZ
Demandantes-Apelantes

v.

AMC EMERGENCY CORP., t/c/c ARECIBO MEDICAL CENTER; *ET AL*
Demandados-Apelados

Núm. KLAN-08-00108

San Juan, Puerto Rico, a 12 de agosto de 2008

Panel integrado por su Presidente, el Juez Martínez Torres, la Juez Feliciano Acevedo y el Juez Miranda De Hostos

Martínez Torres, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El Sr. Felipe Castillo Vega, su esposa la Sra. María del C. Pérez Pérez y la sociedad de bienes gananciales compuesta por ambos, comparecen ante nos por sí y en representación de su hijo Felipe D. Castillo Pérez, para solicitar que revoquemos una sentencia emitida por el Tribunal de Primera Instancia, Sala de Arecibo, el 26 de octubre de 2007 (Hon. Manuel A. Orriola Pérez, Juez). En la referida sentencia, el tribunal *a quo* declaró no ha lugar la demanda al concluir que el tratamiento y atención médica ofrecido al paciente Castillo Pérez cumplió con la buena práctica de la medicina. Por consiguiente, ordenó la desestimación y archivo del caso con imposición de costas y gastos a la parte demandante-apelante.

A solicitud de la parte demandante-apelante, autorizamos la regrabación del juicio y ordenamos la presentación de una exposición narrativa de la prueba oral. No habiendo presentado la parte apelada objeción alguna a la transcripción presentada, aprobamos la misma. Con el beneficio de ésta y de los alegatos de los codemandados-apelados, procedemos a resolver el recurso en sus méritos. Por los fundamentos que a continuación expondremos, revocamos la sentencia apelada.

## I

En la madrugada del viernes, 26 de septiembre de 1997, el menor de 12 años de nombre Felipe D. Castillo Pérez (en adelante, Felipe), desarrolló un dolor fuerte en el lado izquierdo de su abdomen. Sus padres, los

codemandantes, Felipe Castillo Vega y María del C. Pérez Pérez, le administraron un medicamento para el dolor, pero, dado a que éste no cesó, decidieron llevar al menor a las facilidades de AMC Emergency Corp. t/c/c Arecibo Medical Center. Llegaron a la sala de emergencia alrededor de las 7:20 a.m., donde fueron recibidos por el médico de turno, el Dr. José Ortega. Allí, al menor se le tomaron los signos vitales, se le realizó un examen físico, se le ordenaron pruebas de laboratorio (CBC y urinálisis) y se le puso una inyección intramuscular de "*Bentyl*". El examen físico efectuado reflejó un dolor en la fosa ilíaca izquierda. A las 9:30 a. m. se dio de alta al menor con una orden para que visitara a su médico de cabecera y se le recetó tomar una cucharadita dos veces al día del antibiótico "*Septra*", debido a que el análisis de orina mostró glóbulos blancos elevados.

El menor regresó a su hogar donde permaneció en cama el resto del día del viernes, el sábado y el domingo. Según los demandantes, al día siguiente no llevaron al menor al médico de cabecera, debido a que era sábado. El domingo, 28 de septiembre de 1997, Felipe amaneció con el testículo izquierdo hinchado y enrojecido, lo que lo obligaba a caminar con las piernas abiertas. Debido a ello, a eso de las 9:30 p.m., sus padres lo llevaron al CDT de Quebradillas, de donde fueron referidos al Hospital Cayetano Coll y Toste, t/c/c Hospital Dr. Susoni. Allí, el médico de turno le realizó un examen físico y le ordenó análisis de laboratorio, a saber, CBC y urinálisis. No obstante, no le pudo examinar el área genital, debido a que el menor se quejó de mucho dolor en esa área. Finalmente, el médico llegó a un diagnóstico diferencial presuntivo de epididimitis y de torsión testicular.

Debido a que la inflamación no cedía, en la mañana del día siguiente, 29 de septiembre de 1997, se escribió una consulta al Dr. Alberto Ramírez Costa, especialista en urología. Alrededor de las 7:00 a.m., el referido galeno examinó al menor y encontró que, no empece que el testículo izquierdo presentaba dolor e hinchazón, no mostraba torsión testicular alguna. Éste tampoco le pudo palpar adecuadamente el testículo al menor, debido a que éste tenía mucho dolor en esa área. El diagnóstico preliminar del Dr. Ramírez Costa fue una epididimitis. Le ordenó al paciente tomar el antibiótico Depomedrol y un sonograma del testículo con instrucciones de que se le notificaran los resultados inmediatamente.

Una vez se le dio de alta al menor del Hospital Susoni, los codemandantes llevaron el resultado del sonograma a la oficina del Dr. Ramírez Costa. El informe radiológico reflejó una masa no homogénea, intratesticular ecogénica en el testículo izquierdo. El diagnóstico primario del radiólogo fue neoplasia (cáncer) en el testículo izquierdo. El testículo derecho resultó estar normal. El Dr. Ramírez Costa procedió, entonces, a comunicarse con el radiólogo para confirmar el diagnóstico. Finalmente, le recetó un anti-inflamatorio (Depomedrol) para reducir la inflamación en el área testicular y le dio cita para dentro de una semana con el propósito de mantenerlo en observación a ver si la inflamación del testículo cedía.

El 8 de octubre de 1997, el paciente acudió a la cita médica en cuya ocasión el Dr. Ramírez Costa instruyó a los padres de éste a que solicitaran una autorización del plan médico para indigentes (Reforma) para someter al menor a una cirugía conocida como orquiectomía radical transinguinal para remover la masa identificada en el testículo izquierdo.

Los codemandantes regresaron a la oficina del Dr. Ramírez Costa con la autorización para la cirugía, el 15 de octubre de 1997. Al día siguiente, el menor fue intervenido quirúrgicamente en el Hospital Dr. Susoni, donde se le removió el testículo izquierdo y los tejidos extraídos se enviaron a examinar. El resultado de la patología reflejó un hematoma organizado, túbulos necróticos y cambios inflamatorios en el testículo. No se confirmó la existencia de un cáncer ni de una posible torsión testicular.

El 22 de octubre de 1997, el menor regresó a la oficina del Dr. Ramírez Costa para removerse los puntos de sutura y se le dio una cita de seguimiento para el 12 de noviembre de 1997. Sin embargo, no fue hasta el 8 de diciembre de 1997 cuando éste regresó a la oficina del médico que se le pudo dar de alta.

Dos años después, el menor acudió a la oficina del urólogo, el Dr. Renán Dieppa, quien, luego de recibir el historial médico del paciente, le recomendó a éste fijarse el testículo derecho. Posteriormente, Felipe fue intervenido quirúrgicamente con tal propósito.

Así las cosas, el 19 de diciembre de 2003, el Sr. Felipe Castillo Vega, su esposa María del C. Pérez Pérez y la sociedad de bienes gananciales compuesta por éstos, por sí y en representación de su hijo menor, Felipe D. Castillo Pérez, presentaron una demanda enmendada contra el Arecibo Medical Center Emergency Corp. (AMC); el Dr. José Ortega, su esposa y la sociedad de bienes gananciales compuesta por éstos; el Hospital Dr. Susoni; el Hospital Cayetano Coll y Toste; el Dr. Alberto Ramírez Costa, su esposa y la sociedad de bienes gananciales compuesta por éstos. Los demandantes alegaron que cuando el menor demandante tenía 12 años de edad, en la sala de emergencia del AMC, no le realizaron los estudios correspondientes que permitieran diagnosticarle una torsión testicular. Adujeron, a su vez, que el Hospital Susoni y el Dr. Ramírez Costa fueron negligentes y fallaron en proveerle al menor la evaluación y el tratamiento médico necesario aceptado por la profesión médica para la condición que padecía. En resumen, sostuvieron que el codemandante Felipe perdió su testículo izquierdo como consecuencia de una evaluación médica inapropiada, la negligencia y a la mala práctica de la medicina ejercida por los médicos codemandados. Añadieron que, debido al pobre tratamiento médico que recibió desde entonces, el menor se vio expuesto al riesgo de perder el testículo derecho. Finalmente, reclamaron una indemnización por los daños físicos y mentales sufridos por el menor Felipe Castillo como consecuencia de la pérdida de su testículo izquierdo, así como por las angustias mentales alegadamente sufridas por los padres de éste.

Durante los procedimientos, tanto el AMC como el Dr. Ramírez Costa y su esposa contestaron la demanda enmendada. Ambos codemandados negaron las alegaciones de responsabilidad y negligencia presentadas en su contra. Los restantes codemandados no fueron parte del litigio, ya fuera porque no fueron emplazados o porque se emitió sentencia parcial de desestimación de la demanda en su contra.

Una vez realizado el descubrimiento de prueba, en el acta de conferencia con antelación al juicio, las partes estipularon el expediente médico del menor en el AMC, en el Hospital Susoni y en la oficina médica del Dr. Ramírez Costa. La vista en su fondo se celebró los días 23, 24, 25 de octubre de 2006 y el 25 de abril de 2007. La prueba testifical de las partes consistió en el testimonio de los codemandantes, Felipe Castillo Vega, María del C. Pérez Pérez, Felipe D. Castillo Pérez y el perito de éstos, el Dr. Renán Dieppa Álvarez. Se presentó, además, el testimonio del codemandado, el Dr. Ramírez Costa, quien presentó, a su vez, el testimonio pericial del Dr. Andrés A. Acosta Otero. La codemandada AMC, por su parte, presentó el testimonio pericial del Dr. Antonio Puras Báez.

La prueba estipulada consistió: (1) del récord del paciente en las facilidades del AMC; del Hospital Coll y Toste; del Hospital Dr. Susoni y de la oficina del Dr. Ramírez Costa; y (2) del requerimiento de admisiones cursado al Dr. Ramírez Costa. La evidencia documental de la parte demandante consistió del informe pericial del Dr. Renán Dieppa Álvarez. Como parte de la prueba del codemandado Dr. Ramírez Costa, se recibió en evidencia: (1) el *"currículum vitae"* del Dr. Andrés A. Acosta Otero, junto con la opinión pericial de éste; y (2) evidencia demostrativa consistente de láminas con descripciones anatómicas de las estructuras existentes dentro del escroto y las anomalías de éste. Por su parte, el codemandado AMC presentó el *"currículum vitae"* de su perito, el Dr. Antonio Puras Báez, el cual fue estipulado por las partes.

Una vez desfilada y aquilatada la prueba en el caso, el Tribunal de Primera Instancia emitió la sentencia apelada en la que declaró no ha lugar la demanda al concluir que el tratamiento y atención médica ofrecido al paciente Felipe D. Castillo Pérez cumplió con la buena práctica de la medicina. Por consiguiente, ordenó la desestimación y archivo del caso con imposición de costas y gastos a la parte demandante. De dicha sentencia, los demandantes solicitaron al tribunal sentenciador añadir determinaciones de hechos, solicitud que fue declarada no ha lugar mediante resolución del 14 de diciembre de 2007.

Inconforme con dicha determinación, la parte demandante acude ante nos mediante el presente recurso en el que alega, en síntesis, que erró el Tribunal de Primera Instancia: (1) en la apreciación de la prueba desfilada en corte; (2) al no considerar el memorando de determinaciones de hechos y conclusiones de derecho presentado por la parte demandante, a requerimiento del tribunal; y (3) al declarar no ha lugar la moción solicitando determinaciones de hechos adicionales presentada por esa misma parte. Examinados los alegatos y apéndices de las partes, y la transcripción del juicio, resolvemos.

## II

Es doctrina reiterada que para que exista responsabilidad bajo las disposiciones del Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141, la parte actora debe demostrar que el demandado incurrió en una acción u omisión negligente o culposa; la ocurrencia de un daño; y la correspondiente relación causal entre el daño sufrido por dicha parte actora y la conducta negligente o culposa del demandado.

La culpa o negligencia es la falta del debido cuidado, es decir, el no anticipar y prever las consecuencias racionales de un acto u omisión, que una persona prudente y razonable hubiera previsto en las mismas circunstancias. Para determinar la previsibilidad del daño, no es necesario que se haya anticipado el mismo en la forma precisa en que ocurrió, pues basta con que el daño ocasionado sea la consecuencia natural y probable del acto u omisión. *Montalvo Feliciano v. Cruz Concepción*, 144 D.P.R. 748, 755-756 (1998).

Ahora bien, la mera existencia de una acción u omisión negligente no le confiere a la demandante una causa de acción para pedir resarcimiento. La acción instada al amparo de la responsabilidad civil médica, como cualquier otra que se inicie al amparo del Artículo 1802 del Código Civil, *supra*, tiene un carácter estrictamente resarcitorio y existe sólo si el acto negligente del demandado ocasionó un daño real. La reparación del daño sufrido existe sólo como medida del daño sufrido y no del grado de descuido o negligencia del demandado. *Soto Cabral v. E.L.A.*, 138 D.P.R. 298, 309 (1995).

Con relación a los casos de daños y perjuicios por impericia médica, recientemente se resolvió en *Lebrón v. Díaz*, Opinión de 14 de septiembre de 2005, 165 D.P.R. ___, **2005 J.T.S. 135**, a la pág. 177, que para establecer los elementos de esa causa de acción es necesario *"que se presente prueba satisfactoria sobre: (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o especialistas; y (2) la relación causal entre la actuación u omisión del médico y la lesión sufrida por el paciente."* Véanse, además, *López y otros v. Dr. Cañizares*, Op. de 5 de octubre de 2004, 163 D.P.R. ___, **2004 J.T.S. 165**; *Soto Cabral v. E.L.A.*, *supra*, a las págs. 308-309.

En nuestra jurisdicción se ha adoptado la doctrina de la norma mínima de cuidado, la cual dispone que el médico que ofrezca a su paciente aquella atención médica que, a la luz de los modernos medios de comunicación y enseñanza, y conforme al estado de conocimiento de la ciencia y práctica prevaleciente en la medicina, satisface las exigencias generalmente reconocidas por la propia profesión médica, no responde por impericia. *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639, 649 (1988). En casos de impericia médica, el promovente de la acción deberá establecer mediante preponderancia de prueba, que el tratamiento médico suministrado o la ausencia de uno indicado y correcto fue el factor que con mayor probabilidad causó el daño sufrido por el paciente. *Santiago Otero v. Méndez*, 135 D.P.R. 540, 549 (1994): *Hernández Rivera v. Mun. de Bayamón*, 135 D.P.R. 901, 909 (1994).

Dentro del ámbito de sus funciones, se le reconoce al médico una latitud amplia en su discreción al momento de formular su juicio profesional en cuanto al diagnóstico y tratamiento médico. El Tribunal Supremo ha rechazado imponer responsabilidad cuando el médico ha utilizado su buen juicio profesional y el mismo es cónsono con lo razonablemente aceptado por muchos sectores de la profesión médica. *Ramos, Escobales v. García, González*, 134 D.P.R. 969, 975 (1993); *Reyes v. Phoenix Assurance Co.*, 100 D.P.R. 871, 876 (1972).

Al médico le acompaña una presunción al efecto de que ha ejercido un grado razonable de cuidado y de que el tratamiento brindado fue adecuado. El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya tenido éxito, no crea ninguna presunción de negligencia por parte del médico. La parte demandante no podrá descansar para rebatir esta presunción en una mera posibilidad de que el daño se debió al incumplimiento de parte del médico de su obligación profesional. Ello requiere que la relación de causalidad no se establezca a base de una mera especulación o conjetura. *Ramos, Escobales v. García, González, supra*, a las págs. 975-976.

### III

En el caso de autos, los demandantes-apelantes atacan la apreciación que de la prueba desfilada en el juicio realizara el Tribunal de Primera Instancia. Alegan que la prueba vertida durante el juicio estableció de manera contundente la negligencia del AMC en el tratamiento y diagnóstico del menor demandante. Aducen, a su vez, que el Dr. José Ortega incumplió con su deber jurídico de realizarle un diagnóstico diferencial al menor codemandante, mientras que el Dr. Ramírez Costa descartó un diagnóstico diferencial de torción testicular emitido por el médico de sala de emergencias del Hospital Susoni sin realizar las pruebas adecuadas que permitieran descartar la misma, de acuerdo a lo que se considera una buena práctica de la medicina.

En cuanto al tratamiento médico suministrado al menor codemandante en las facilidades del codemandado AMC, el foro apelado tuvo la oportunidad de evaluar el testimonio, tanto del perito de la parte demandante-apelante, el Dr. Renán Dieppa, como de los peritos de los codemandados-apelados, el Dr. Andrés Acosta Otero (Dr. Ramírez Costa) y el Dr. Antonio Puras Báez (AMC), respectivamente. También tuvo ante sí copia de los informes suscritos por estos peritos y escuchó los testimonios de las partes en el caso. A base de ello, resolvió que en el presente caso el tratamiento y atención médica ofrecido al paciente Castillo Pérez cumplió con la buena práctica de la medicina. Por consiguiente, ordenó la desestimación y archivo del caso.

Es norma general que un tribunal apelativo no intervendrá con la apreciación de la prueba hecha por el Tribunal de Primera Instancia en ausencia de error manifiesto, prejuicio, pasión o parcialidad. *Orta v. Padilla Ayala*, 137 D.P.R. 927 (1995); *Rodríguez Oyola v. Machado Díaz,* 136 D.P.R. 250 (1994). No obstante, cuando se trata de prueba pericial y documental, los tribunales apelativos están en la misma posición que el Tribunal de Primera Instancia para evaluar y llegar a sus propias conclusiones de derecho. *Colón v. Glamorous Nails & Boutique, Inc.*, Op. de 3 de febrero de 2006, 166 D.P.R. ___ (2006), **2006 J.T.S. 25**; *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988). Los tribunales tienen amplia discreción en la apreciación de la prueba pericial pudiendo aun adoptar su propio criterio en la apreciación o evaluación de la misma y hasta descartarla aunque resulte técnicamente correcta. *Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R.,* 150 D.P.R. 658 (2000).

Del expediente ante nos, surge que el 26 de septiembre de 1997, los codemandantes, los esposos Castillo-Pérez, se presentaron a las 7:20 a.m. con su hijo menor Felipe a la sala de emergencia del AMC debido a que éste se quejaba de un dolor en el lado inferior izquierdo del abdomen. Allí lo atendió el Dr. José Ortega, quien en ese momento estaba a cargo de la sala de emergencia de la referida facilidad. Del expediente clínico del AMC —el cual fue admitido en evidencia por estipulación entre las partes—, surge que en esa visita al menor se le tomaron los signos vitales y se le realizó un examen físico, el cual reflejó un dolor en la fosa ilíaca izquierda. También se le administraron pruebas de laboratorio (CBC y orina) y se le puso una inyección intramuscular de "*Bentyl*". La nota de enfermería establece que el paciente tenía dolor abdominal desde las 5:00 a.m. El diagnóstico médico fue de dolor abdominal. A las 9:30 a.m. se dio de alta al menor con una orden para que visitara a su médico de cabecera y se le recetó tomar una cucharadita dos veces al día del antibiótico "*Septra*", debido a que el análisis de orina mostró glóbulos blancos elevados. Anejos I y II, del apéndice del alegato de la parte apelada.

De acuerdo con el testimonio vertido durante el juicio por el perito de la parte demandante, el Dr. Renán Dieppa, —quien declaró haber ofrecido conferencias a médicos de sala de emergencia en varias ocasiones— al atender un paciente de 12 a 14 años que llega con un dolor abdominal lo primero que se debe hacer es: (1)

tomarle un buen historial médico sobre el dolor abdominal; (2) realizarle un buen examen físico en el área del abdomen, consistente en palpar con la mano los cuatro cuadrantes y, de reflejar que hay algún problema abdominal, (3) ordenarle, por lo menos, una placa sencilla y un sonograma. T.P.O., págs. 17-18. Añadió que "*lo automático es mandar a hacer unos laboratorios y antes que lleguen los laboratorios, ya el paciente se está haciendo un sonograma con doppler.*" T.P.O., pág. 29. Sobre la importancia que tiene el realizar un examen físico adecuado para poder hacer un diagnóstico certero, el perito señaló que éste constituye un 90% de la totalidad del diagnóstico. T.P.O., pág. 22. Asimismo, sostuvo que "*un examen completo es de importancia en cualquier paciente que va a Sala de Emergencia, no importa la edad*". T.P.O., pág. 23.

Durante su testimonio, el referido galeno explicó que si las pruebas reflejan que todo está negativo y el paciente es un varón y es joven, hay que examinarle las genitalias. Añadió que en el caso de un varón con dolor en el vientre bajo es mandatorio, no solamente limitarse al abdomen, sino auscultar otras áreas del cuerpo. A preguntas del abogado, indicó que el hecho de que se realizó ese examen físico debe constar por escrito en el récord de sala de emergencia. T.P.O., págs. 19-20.

Por su parte, el Dr. Acosta, perito del codemandado Dr. Ramírez Costa, coincidió con el Dr. Dieppa en que, en el caso de un paciente de 12 a 14 años que llega con un dolor abdominal en el cuadrante bajo izquierdo de su estómago, se le debe hacer un examen físico, el cual debe incluir "*palpación, inspección primero de...del cuerpo desnudo, eh...y...con palpación de la zona que más le molesta al paciente uno elabora ese examen a base de experiencia y conocimiento de otras zonas que puedan causar la queja del paciente, eso incluye sus genitales, eh...en el caso especialmente de...de niños y hasta el pecho se examina.*" Admitió que el no realizar el referido examen, constituye una omisión. T.P.O., págs. 458-459. Ésta fue su declaración sobre el particular:

"*P. Pero estamos de acuerdo que obviamente si tiene dolor abdominal un niño de 12 o...de 12 a 14 años, hay que bajarle los pantalones y chequearle la genitalia.*

*R. Eh...a mi entender, sí.*

*P. Sí. Y el no hacerlo sería una omisión, ¿cierto?*

*R. En ese caso sí.*

P. Sí. Mire y le pregunto si es o no es cierto que hay literatura, como usted citó ayer, que tenía literatura, que inclusive no presentó por sus razones que dio, eh...hay literatura que los síntomas de una posible torsión puede empezar con un dolor abdominal bajo que se refleja en la parte del escroto, ¿sí?

R. Eh...eh...a la inversa podría ser más cierto.

P. Pero puede ser también.

R. En una patología de genitalia, eh...específico del escroto podría reflejarse como dolor referido del abdomen.

*P. Al abdomen. Y lo cierto es que si no se hace una prueba de genitalia ese examen es incompleto, ¿verdad que sí?*

*R. En todo el honor a la verdad me parece que sí.*" (Énfasis nuestro.)

T.P.O., págs. 458-459.

335

Incluso, el propio perito del codemandado AMC, el Dr. Puras, aceptó estar de acuerdo con el perito de la parte demandante en cuanto a que en un caso como éste —de un menor de 12 años con dolor abdominal en el área izquierda inguinal—, él le hubiese hecho una prueba de genitalia al paciente. T.P.O., pág. 640.

Más adelante, al ser contrainterrogado sobre la posibilidad de haberle salvado el testículo al menor, el Dr. Dieppa contestó lo siguiente:

"P. [...] Oiga, y en su informe hay una cosa me [que] me llama la atención que dice que el doctor de Sala de Emergencia si hubiera encontrado esa torción testicular se hubiera convertido en un héroe. ¿Por qué usted dice eso?

R. Porque ya estaba a tiempo para salvar el testículo.

Posteriormente, a preguntas del abogado de la parte demandante sobre ese mismo asunto, el referido galeno indicó que "de haber ocurrido la torsión, esa primera visita era crucial, el examen físico es crucia[l], un diagnóstico es crucial. [...]." T.P.O., pág. 101.

Por otro lado, al Dr. Dieppa se le requirió dar su opinión en cuanto al historial médico que preparó la sala de emergencia del AMC sobre el menor. Su opinión fue la siguiente:

"P. En su opinión, el no establecer que se hayan hecho exámenes, ni que se hayan verificado las genitalias, ni que se hayan llevado a cabo exámenes exactos sobre un paciente, sería concluir que ese expediente no está conforme a los estándares de la buena práctica.

[...]

R. No necesariamente, en Sala de Emergencia, este, en una consulta o un expediente médico de un paciente que yo admito al hospital tengo que documentar todo. Y el no documentarlo conlleva que, o lo obvié o no lo examiné, o sencillamente no lo había. Pero, realmente, si uno tiene un paciente con múltiples quejas, yo pongo las múltiples quejas ahí porque me lo está diciendo, eso es parte del récord del paciente, y eso me ayuda a mí a recordarme qué es lo que tenía y qué son las cosas también que tengo que hacer.

P. Y le pregunto, doctor, si el no establecer en un expediente médico de una Sala de Emergencia los exámenes exactos que se llevaron a cabo a ese paciente, ¿si eso no es una práctica reconocida como buena práctica de la medicina?

R. Tiene que serlo todo, este, aquí solamente se basaron en un CBC y en orina y eso no me dice nada porqué [sic] el paciente llega con... con un dolor abdominal."

T.P.O., págs. 24-25.

Más adelante, sobre el mismo asunto, declaró lo siguiente:

"P. A base de ese historial que usted tiene ahí y ese examen médico, y a base de su opinión, ¿entiende usted que ese historial médico y ese examen físico que se le hizo a ese paciente, conforme a ese récord es una buena práctica de la medicina?

R. Está bien incompleto.

**P. Y si es bien incompleto, le pregunto si cumple con los estándares de la buena práctica de la medicina, a**

*base de su opinión.*

*R. No señor, no cumple.*

*P. ¿Cuán importante en ese paciente era que se hubiese establecido correctamente los síntomas o los... las pruebas que... que correctamente habían [sic] que hacer?*

*R. De haber un buen examen abdominal, de haber puesto las posibilidades que puede haber traído, este examen, la queja de dolor y un examen abdominal, él pudo haber llegado a más conclusiones sobre las quejas de... de Felipe. Este... porque dolor abdominal no le pone ningún diagnóstico, eso es un síntoma, así que... es lo mismo que... que una persona que viene con fallo al corazón, eso es un síntoma, hay que ver porque [sic] es el fallo del corazón. Aquí... el diagnós... esto no es un diagnóstico, abdominal pain, no es un diagnóstico, esto es un síntoma. Diagnóstico hubiera sido este... Apendicitis, Vesícula este...inflamada, una Colitis, torsión de testículo, eso es un diagnóstico, dolor abdominal es un síntoma.*

*[...]*

*P. Conforme a ese expediente que usted tiene y de su opinión, ¿qué cosas ese médico o el médico y Arecibo Medical Center, omitieron hacer con relación a Felipe Castillo, que se debieron haber hecho conforme a los mejores parámetros de la medicina?*

*R. Si yo pensara que fuese una infección de orina, por lo menos un sonograma abdominal para chequear los riñones, le hubiera...le hubiera hecho. Este...y ese es el primer estudio que se hace y se hace en Sala de Emergencia. Eh... a base de ese estudio, si sale bien entonces suponiendo que había una infección de orina y no era lo que surgió ser lo del testículo, pues entonces el paciente va a requerir uso médico con esa información para que siga en el diagnóstico el porqué tiene infección de orina. Hay que hacer más estudios de la vejiga y entonces se sigue tratando la infección hasta que se le quite.*

*P. ¿Y si no es infección de orina?*

*R. Pues entonces hay que buscar qué otras cosas pueden causar este problema.*

*P. ¿Qué se debió haber hecho, según su opinión, con relación a este paciente que llega con un dolor abdominal en el lado izquierdo de su abdomen.*

*R. Como le dije, este record (sic) está bien limitado en poder llegar a una conclusión, porque no puedo dar un historial adecuado para llegar a esa conclusión. Segundo, el examen físico careció de un examen completo; y tercero, no hicieron, más allá de lo ordinario, un CBC y orina que establezca un diagnóstico ni tampoco escribió el diagnóstico final. Si había infección de orina lo dejó como dolor abdominal.*

*P. Le pregunto ¿si entiende usted que este paciente debió haber permanecido algún tiempo en observación?*

*R. Por lo menos yo encuentro que dos horas dentro y fuera es bien rápido. Especialmente cuando uno no ha establecido un diagnóstico.*

*P. Quiere decir que ese paciente fue dado de alta de una Sala de Emergencia sin tener un diagnóstico que dijera la razón por la cual Felipe estaba allí.*

*R. Eso...eso es así.*

*P. Y a base de su opinión le pregunto, si con ese historial médico y ese... y ese examen físico que se hizo en Arecibo Medical Center, si él hubiese asistido a donde un Urólogo, ¿si era fácil determinar la condición que tenía Felipe?*

*R. Si hubieran traído a un Urólogo porque tenía infección de orina, yo...ese mismo día se hubiera sacado el diagnóstico."* (Énfasis nuestro.)

T.P.O., págs. 36-40.

El perito del codemandado AMC, el Dr. Puras, coincidió con el Dr. Dieppa en cuanto a que el récord preparado en Sala de Emergencias, para propósitos de diagnóstico y documentación, no estaba completo. Al ser contrainterrogado sobre el particular, declaró lo siguiente:

*"P. Mire, cuando yo le hice la deposición a usted yo le pregunté si el récord del AMC para efectos suyos era un récord completo. Y le pregunto, si usted en aquella ocasión me contestó que para efectos suyos no.*

*R. No, es un récord que no está completo.*

*P. No está completo. Mire y también le pregunté si usted me podía testificar sobre los aspectos de emergencia y me dijo, "yo tampoco puedo testificar si está bien hecho este récord con relación a Emergencia porque yo no trabajo con las emergencias." Dígame si usted me testificó eso.*

*R. Bueno, yo no trabajo con emergencias como Emergenciólogo, yo trabajo emergencias urológicas."* (Énfasis nuestro.)

T.P.O., págs. 609-610.

Más adelante, el mencionado galeno declaró lo siguiente:

*"P. Mire doctor, ¿qué usted me diría si por prueba testifical se ha desfilado prueba aquí de que cuando ese médico ve a Felipe lo que le dice es que tiene escuelitas y no le hace ningún chequeo ni lo toca. ¿Qué usted me dice de eso, que eso es un buen tratamiento?*

*R. No, eso no es...*

*P. No es un buen tratamiento.*

*R. No es un buen ejercicio diagnóstico.*

*P. No es un buen ejercicio diagnóstico. Y al completar eso, en eso estamos de acuerdo, que ese récord que usted tiene no tiene un adecuado historial médico ni examen físico adecuado, conforme a lo que usted ha testificado.*

*R. Urológico, no tiene un examen físico urológico.*

*P. Urológico. De emergencia usted no me puede decir si es bueno o está mal.*

*R. Eso es correcto.*

*P. Porque usted no trabaja con Emergencia. A contrario al doctor Ramón Dieppa que testificó aquí que sí le*

*daba entrenamiento a los médicos de emergencia."* (Énfasis nuestro.)

T.P.O., pág. 621.

De los testimonios antes citados, surge que todos los peritos que declararon durante el juicio coinciden en que el examen realizado al menor en su visita al AMC estuvo incompleto. La prueba pericial demostró que, en el caso de niños varones entre las edades de 12 a 14 años con dolor en el abdomen, es mandatario examinarle los genitales, ya que los casos de torsión testicular a menudo comienzan con dolor en el vientre bajo del lado donde está el testículo torcido. Además, se estableció que, en caso de sospecha de una torsión testicular, lo más confiable es realizar un sonograma con doppler para determinar si hay flujo sanguíneo en el testículo y, de esa forma, descartar una torsión testicular.

De la prueba pericial presentada también se desprende que para llegar a un diagnóstico certero en el caso, era imprescindible realizar un buen historial médico sobre el dolor abdominal y un buen examen físico en el área del abdomen del paciente. Además que, por lo menos, se debió haber ordenado una placa sencilla y un sonograma abdominal. No obstante, el expediente médico de la Sala de Emergencias de AMC evidencia tanto la ausencia de un examen genital al menor codemandante como la realización de un sonograma abdominal.

Del expediente del caso surge que el menor Felipe fue dado de alta del hospital codemandado sin que se hubiese llegado a un diagnóstico específico. El médico que lo atendió en Sala de Emergencias, el Dr. Ortega, se limitó a atacar el síntoma de dolor abdominal con un antiespasmódico (Bentyl), sin realizarle al menor otro tipo de exámenes y auscultar más a fondo sobre cuál era la causa del referido dolor. Incluso, el propio perito de la codemandada AMC fue confrontado con la deposición que le fue tomada previamente, en la que aceptó que al menor se le pudieron haber hecho más exámenes y que, inclusive, se le pudo haber dejado por 24 horas en observación. T.P.O., págs. 646-647.

En resumen, la prueba pericial desfilada en el caso demostró que el menor codemandante Felipe Castillo careció de una buena evaluación médica en la Sala de Emergencias de la AMC y que el médico de Sala de Emergencias faltó al deber de cuidado médico al: (1) no examinar la genitalia del menor; (2) no realizar otros exámenes y estudios adecuados; (3) no mantener al paciente en observación por 24 horas; (4) no realizar un diagnóstico diferencial; (5) no preparar un récord médico completo y adecuado con el historial del paciente; y (6) no consultar a un médico especialista.

Entendemos que la evidencia vertida durante el juicio establece claramente que el AMC fue negligente en la atención y cuidado médico brindado al menor codemandante. La atención médica brindada a éste por dicha facilidad hospitalaria no satisface las exigencias de la práctica prevaleciente de la medicina, por lo que concluimos que la codemandada AMC incurrió en impericia médica.

### IV

Corresponde examinar, en segundo lugar, si la atención médica brindada por el Dr. Ramírez Costa, urólogo, al menor codemandante cumplió con los estándares de la práctica prevaleciente de la medicina.

De los autos del caso surge que el 29 de septiembre de 1997, el menor visitó la Sala de Emergencias del Hospital Dr. Susoni, a donde llegó con dolor testicular y un escroto agudo. Luego de examinar al menor, el médico de turno llegó a un diagnóstico presuntivo de epididimitis y torsión testicular. Debido a ello, se procedió a hacer una consulta médica al Dr. Ramírez Costa, urólogo, sobre el caso del menor codemandante. A la mañana siguiente, el referido galeno examinó al paciente y encontró que el testículo izquierdo de éste presentaba dolor e hinchazón. No obstante, alegó no haber encontrado torsión testicular alguna. Finalmente, llegó a un diagnóstico preliminar de epididimitis, por lo que le ordenó al paciente tomar el antibiótico Depomedrol y realizarse un sonograma del testículo. Confrontado con los resultados del sonograma —que reflejaban que el testículo

izquierdo estaba hinchado y que, en la opinión del radiólogo, se trataba de una neoplasia—, el referido galeno le dio cita al menor para dentro de una semana para ver si la inflamación cedía. En la cita de seguimiento, al ver que el menor continuaba con el testículo inflamado, le dio instrucciones a los padres de éste para que consiguieran una autorización del plan médico de la Reforma para someter al paciente a una cirugía. El 15 de octubre de 1997, los codemandantes acudieron a la oficina médica con la autorización de la Reforma. Al día siguiente, el menor fue sometido a una intervención quirúrgica, la que tuvo como resultado la remoción de su testículo izquierdo.

Del testimonio del Dr. Ramírez Costa surge que a los efectos de llegar a un diagnóstico médico sobre la condición del menor, éste no miró el expediente de AMC; no verificó el récord de Sala de Emergencias del Hospital Susoni, así como tampoco consideró el *"rule out"* al que llegó el médico que allí lo atendió. Al ser interrogado sobre la razón para descartar el *"rule out"* hecho por el emergenciólogo, éste indicó que *"la mayoría de las veces yo no le hago mucho caso, porque son erróneos muchos de ellos"*. T.P.O., pág. 285. Asimismo, aceptó no haber leído el récord de Sala de Emergencias, ya que alegó que lo único que le interesaba eran los laboratorios. T.P.O., pág. 287.

La opinión del perito de la parte demandante, Dr. Dieppa, sobre el manejo del caso por parte del Dr. Ramírez Costa fue la siguiente:

*"P. Bien. Mire, le pregunto, eh... si hay posibilidad de que este muchacho hubiese sufrido de una... cuando llega a Arecibo Medical Center, de los principios de una torsión testicular y la misma se convirtiera en intermitente, y posiblemente cuando llegó a donde las manos del doctor Ramírez Costa ese testículo tenía probabilidades de vivir.*

*R. Es una probabilidad, no puedo decir si es cierto porque no están las pruebas para corroborarlo, Pero de haberse explorado en ese momento, no haber esperado el certificado por nueve días, este... es posible. Pero usualmente cuando están bien hinchado, la única forma de saberlo es cuando se exploran.*

***P. Bien. Quiere decir que en su opinión, el doctor Ramírez Costa no cumplió con los estándares de la buena práctica de la medicina al no llevar a cabo un examen de sonograma con doppler hacia este menor.***

***R. Lo usual hubiera sido con doppler para descartar eso o saber si había epididimitis.***

*P. Y si no había... no se hacía el sonograma, había que, entonces, hacerle una operación, explorarlo.*

*R. Así dicen los libros."* (Énfasis nuestro.)

T.P.O., págs. 47-48.

*"[...]*

*P. ¿Cuál fue el resultado final con el testículo de Felipe? ¿Qué pasó con el testículo?*

*R. Lo sacaron.*

*P. ¿Por qué lo sacaron?*

*R. Eh... porque el sonograma fue leído como una...una lesión intratesticular, una neoplasia, o un cáncer.*

*P. ¿Un cáncer? Y que pasó, que [sic] prueba, si alguna, hizo el doctor Ramírez Costa para excluir la torsión del testículo que le había dado el médico de Sala de Emergencias?*

*R. No hay un Color flow doppler, ni tampoco un estudio nuclear de testículo para evidenciar si había flujo sanguíneo o no.*

***P. A base de su opinión, ¿eso fue una buena práctica de la medicina hacer esa omisión?***

***R. Bueno, la buena práctica conlleva que uno tiene que ver todas las posibilidades.***" (Énfasis nuestro.)

T.P.O., págs. 51-52.

*"[...]*

*P. Le pregunto. ¿qué pruebas se hicieron para descartar epididimitis?*

*R. Básicamente, el urinálisis y el CBC.*

*P. ¿Eso eran suficientes para descartar esa condición?*

*R. No, señor, porque un escroto agudo las dos, los dos diagnósticos que se entretienen en que tenía que ser... es o torsión o epididimitis. Una se distingue de la otra sencillamente con un sonograma testicular con un color flow, un doppler color flow. Como mencioné anteriormente en epididimitis va a estar aumentada al flujo, en una torsión va a estar aumentada al flujo, en una torsión va a estar disminuida o ausente. O sea, que la mejor forma de distinguir una cosa a la otra y dar el tratamiento adecuado sería haciendo la prueba completa. El sonograma sin color flow, incompleto.*

***P. Por lo tanto, que según su opinión el tratamiento que recibió es uno que no cumple con el goal standard de la buena práctica de la medicina.***

***R. Porque es incompleto.***

***P. Y por lo tanto, no cumple con el buen.. con la buena práctica de la medicina.***

***R. Sí, señor.***" (Énfasis nuestro.)

T.P.O., pág. 57.

Cabe mencionar que durante el contrainterrogatorio, el Dr. Ramírez Costas no descartó la posibilidad de que en el momento en que examinó al menor éste tuviera una torsión testicular, ya que presentaba todos los síntomas. No obstante, aclaró que no pudo corroborar la existencia de ésta porque, aunque pudo palpar el cordón del testículo, se le hizo imposible examinar de manera exhaustiva el testículo en sí porque el niño no se dejó tocar, ya que tenía mucho dolor en esa área. T.P.O., pág. 326.

De la transcripción de la prueba oral surge la importancia de haberle realizado un sonograma con doppler al menor para identificar de forma concluyente si el testículo de éste estaba torcido o no, en especial en casos como el del menor que nos ocupa, en los que hay que descartar un diagnóstico de no torsión del testículo.

La opinión del Dr. Acosta, perito de la parte codemandada AMC, sobre el hecho de no haberse ordenado un sonograma con doppler, fue la siguiente:

*"P. Doctor, asuma usted que en este caso había una sospecha de torsión testicular y que el resultado del sonograma fue el que ya conocemos de un neoplasma. ¿Qué debió haber hecho el Urólogo ante esa*

*circunstancia?*

*R. Pues, mi... opinión es que si usted tiene el recurso de descartar falta de flujo de sangre, pues... utilícelo para establecer por... dentro de un tiempo limitado. Por eso es que el doppler supera a otros recursos tecnológicos que toman mucho tiempo, porque como la torsión testicular, si es lo que se sospecha, es una cuestión, es un paréntesis de pocas horas."*

T.P.O., pág. 390.

Sobre la controversia de la importancia de ordenar un sonograma con doppler, el codemandado Dr. Ramírez Costa declaró que aun cuando está consciente que, ante la imposibilidad de palpar de manera exhaustiva un testículo, la mejor alternativa es realizar un sonograma con doppler para poder ver el flujo sanguíneo, en este caso no lo hizo porque, según él, a esa fecha el Hospital Dr. Susoni no contaba con ese tipo de equipo. Posteriormente, al ser contrainterrogado y confrontado con la deposición que se le había tomado previamente, éste tuvo que admitir que la realidad fue que al momento de ordenar el sonograma no se acordaba si el hospital lo tenía con doppler o no. Su testimonio al respecto fue el siguiente:

*"P. Mire doctor, la pregunta es sencilla, cuando usted le envió a hacer el sonograma, lo cierto es que usted no sabía, si había o no había doppler en el hospital.*

*R. No me entendió. Yo no estaba seguro si había doppler pero any way...*

*P. Por eso...*

*R. ...lo hacen, cuando lo tienen...lo hacen de rutina.*

*P. Por eso, pero usted no sabía si había doppler o no y no lo ordenó específicamente...*

*[...]*

**P. Doctor, el detalle es que si usted tenía conocimiento que si al momento de evaluar al joven había en el hospital ese sistema de doppler para hacer ese tipo de examen.**

**R. Supuestamente no había doppler.**

*P. No, esa no és la pregunta.*

*R. Pues, cuál es la pregunta, porque...*

**P. En la deposición que él acaba de leer dice, "No recuerdo si en ese año había doppler". No sabía.**

*[...]*

**R. Yo no recuerdo si había doppler o no, punto.**

*P. Okay."* (Énfasis nuestro.)

T.P.O., págs. 296-297 y pág. 320.

Por su parte, el perito de la parte codemandada AMC, el Dr. Acosta, opinó que ante la ausencia de un

sonograma con doppler, ameritaba entonces hacer una exploración para confirmar el resultado del sonograma regular, debido a que éste no refleja el flujo sanguíneo del testículo. T.P.O., págs. 574-575. Posteriormente, al ser confrontado con el testimonio vertido en su deposición admitió que, ante una situación como esa, él hubiese buscado a un amigo suyo que tuviese un doppler y le hubiese hecho el examen al menor. T.P.O., págs. 539-541. La realidad es que el menor pudo ser referido y trasladado a un hospital que contara con el equipo necesario para ese estudio, pero eso ni siquiera se intentó.

Así también, como parte de su testimonio, el Dr. Ramírez Costas fue contrainterrogado en cuanto al extenso tiempo transcurrido desde que vio los resultados del sonograma hasta que el menor fue sometido a la intervención quirúrgica. Su fundamento para la larga espera fue el siguiente:

*"P. Okay. Mire, y teniendo usted un cáncer, un estudio que dice que este muchacho tiene un tumor, ¿qué justificación tiene usted como médico el tener que esperar tanto tiempo como el que se esperó para hacer esa operación.*

*R. Este joven tenía Reforma y yo no puedo entrar en ningún paciente en una Sala de Operación en ningún hospital si no tengo el referido...*

*T.P.O., pág. 321.*

*[...]*

*P. Esa es la pregunta, si usted no tiene [un] sonograma doppler y usted no puede palpar bien ese testículo, ¿qué es lo que se supone que usted haga, bajo una sospecha de torsión testicular?*

*R. Pues, se refiera.*

*P. Se refiera a dónde.*

*R. Al Centro Médico, al Pediátrico.*

*P. Y por qué usted no lo hizo?*

*R. Porque no era necesario, el Pediátrico no puede ver todos los casos de Urología pediátricos...*

*P. Esa era una apreciación que usted tenía, de necesario o no necesario y por eso lo dejó casi 16 días no lo intervino.*

*R. No señor.*

*P. Bien.*

*R. Lo dejó la Reforma 16 días.*

*P. Mire a ver si usted hubiese hecho una gestión con la Reforma y hubiese llamado diciendo que usted tenía un niño allí que estaba a punto de perder un testículo, que tenía una emergencia quirúrgica. Mire a ver si usted no le hubiesen dado una aprobación para que usted hubiese hecho esa intervención. Dígame si es o no, que se hace eso.*

*R. Yo mandé a buscar con el médico primario el referido de inmediato.*

*P. No doctor, le estoy preguntando usted, usted mismo, cuando usted se encontró con ese niño, con ese escroto agudo...*

*R. Mi experiencia es que no.*

*P. ... con todos los síntomas, le pregunto si usted lo trató de hacer. Si lo hizo.*

*R. La experiencia me dice que no.*

*P. No lo hizo.*

*R. No, porque no funciona.*

*P. No lo hizo.*

*R. No sirve."*

T.P.O., págs. 328-329.

Los testimonios periciales vertidos en juicio revelan que el Dr. Ramírez Costa se apartó de la buena práctica de la medicina al: (1) descartar el diagnóstico diferencial de torsión testicular emitido por el médico de Sala de Emergencias del Hospital Susoni; (2) no ordenar o realizar, ni trasladar al paciente para que se realizara, un sonograma con doppler del testículo afectado a los fines de observar el flujo sanguíneo de éste y descartar la posibilidad de una torsión testicular; (3) no realizarle al menor una exploración del testículo para verificar la circulación de éste, ante la ausencia de un sonograma con doppler; y (3) al esperar 16 días para operar al menor luego de haber visto los resultados del sonograma, los cuales indicaban la posibilidad de que el menor tuviera cáncer en el testículo y ante el hecho de que el menor presentaba un escroto agudo y dolor intenso e inflamación en el testículo izquierdo. El menor debió haber sido operado de emergencia, pero se esperó por un papel tras el trámite burocrático del plan médico. Eso fue contraproducente e innecesario ante la presencia de una verdadera emergencia que requería cirugía y no podía esperar.

A la luz de los hechos acontecidos en el presente caso y luego de un análisis minucioso de la transcripción de la prueba oral, de los informes periciales y de los autos, resolvemos que la actuación del Dr. Ramírez Costa se apartó de las normas de cuidado médico exigidas por la profesión médica en el diagnóstico y tratamiento brindado al menor codemandante.

Analizados los eventos en el presente caso, resolvemos que existe un nexo causal entre el daño sufrido por el menor Felipe Castillo y las actuaciones y omisiones tanto del AMC como del Dr. Ramírez Costa. La causa directa de la pérdida del testículo izquierdo del menor Felipe Castillo se debió única y exclusivamente a las omisiones y actos negligentes del AMC, en mayor grado, y del Dr. Ramírez Costas, en un grado menor. Las omisiones negligentes de AMC causaron probablemente la pérdida del testículo del niño. Por su parte, la omisión del Dr. Ramírez Costa, al no intervenir quirúrgicamente al menor con la premura que la situación requería, al menos si no podía evitar la pérdida del testículo prolongó el dolor y el sufrimiento del niño sin que hubiera una razón válida para la espera de 16 días.

Según mencionáramos anteriormente, este Tribunal se encuentra en igual posición que el tribunal *a quo* para evaluar la prueba pericial vertida durante un juicio. Así, luego de estudiar detenidamente lo declarado por los tres peritos, resolvemos que en efecto, el Tribunal de Primera Instancia erró en la apreciación que de dicha prueba realizara. Consideramos imperativo intervenir con las determinaciones de hechos del foro *a quo* a los efectos de concluir que en el caso de autos los codemandados AMC y el Dr. Ramírez Costa se apartaron de la norma

prevaleciente en la práctica de la medicina en el diagnóstico y tratamiento brindado al menor codemandante Felipe D. Castillo, por lo que incurrieron en negligencia e impericia médica. A base de la prueba pericial antes reseñada, determinamos que el grado de negligencia de las partes codemandadas es de un 80% para AMC por sus omisiones negligentes, y de un 20% para el Dr. Ramírez Costas, por no actuar con la premura que requería lo cual prolongó el dolor y sufrimiento del niño, sin razón válida. Ante esta decisión, entendemos innecesario la discusión de los restantes señalamientos de error.

## V

Por los fundamentos antes expuestos, revocamos la sentencia apelada y devolvemos el caso al Tribunal de Primera Instancia para que dicho foro valorice los daños sufridos por los codemandantes y ordene la indemnización que corresponda.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal.

María E. Pérez Ortiz
Secretaria Tribunal de Apelaciones